# EXHIBIT B


TRANSPERFECT

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Ayala Otero v Rivera Nieves**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

_____
Jacqueline Yorke

Sworn to before me this
February 23, 2022

_____
Signature, Notary Public

WENDY POON
STATE
OF NEW YORK
NOTARY PUBLIC
Qualified in
Queens County
01PO6356754
MY COMMISSION EXPIRES 04-03-2025

_____
Stamp, Notary Public

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 3 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

2016 WL 5369286 (TCA)

Samuel AYALA OTERO, Plaintiff and Appellant

vs.

Eduardo RIVERA NIEVES, Insurance Company A;
Omar Matos; William Venegas; Editorial Televisa–
Puerto Rico, h/n/c Revista TV y Novelas de Puerto
Rico; Insurer B; Leo Fernandez III; Saudy Rivera;
Soraya Sanchez; Es Televisión Corp; Telemundo of
Puerto Rico Inc.; Insurance Company C; Diosdada
Romero; Tomas Ramos, t/c/c Red Shadow; Raad
Broadcasting Corp; Insurer D; So-and-so, Defendants
and Appellees. Samuel Ayala Otero, Plaintiff and
Appellee

vs.

Eduardo Rivera Nieves, Insurance Company A; Omar
Matos; William Venegas; Editorial Televisa–Puerto
Rico, h/n/c Revista TV y Novelas de Puerto Rico;
Insurer B; Leo Fernandez III; Saudy Rivera; Soraya
Sanchez; Es Televisión Corp; Telemundo of Puerto
Rico Inc.; Insurance Company C; Diosdada Romero;
Tomas Ramos, t/c/c Red Shadow; Raad Broadcasting
Corp; Insurer D; So-and-so, Defendants and Appellants.

APPEALS COURT
Case No.: E DP20140136
KLAN201600735 CONSOLIDATED
WITH KLAN201600763
June 27, 2016.
In San Juan, Puerto Rico, on June 27, 2016.

APPEAL from the Court of First Instance, Superior Chamber
of Caguas
Regarding: Damages

Panel composed of its presiding judge, Judge Fraticelli
Torres, Judge Ramos Torres, and Judge Steidel Figueroa [1]

**JUDGMENT**

FRATICELLI TORRES, REPORTING JUDGE

**\*1** Mr. Samuel Ayala Otero, [2] Editorial Televisa–Puerto Rico,
h/n/c Revista TV y Novelas de Puerto Rico, and Messrs. Omar
Matos Figueroa and William Venegas Guzmán [3] appear, with
separate recourses for appeal, to request a review of the partial
summary judgment issued on April 12, 2015 by the Court of

First Instance, Superior Chamber of Caguas. Through said
opinion, the court appealed against dismissed with prejudice
all the causes of action brought by Mr. Ayala against
Telemundo de Puerto Rico, Inc., ES Televisión, Corp., Saudy
Rivera, Leopoldo Fernández Rivera, Diosdada Romero López,
Tomás Ramos Cruz, and Raad Broadcasting, Corp.

Similarly, it dismissed with prejudice the claim for defamation
filed by Mr. Ayala against Editorial Televisa Puerto Rico, Inc.,
Omar Matos Figueroa, and William Venegas Guzmán, but left
valid the cause of action for the violation of image rights
against these three defendants.

After evaluating the merits of both appeals, reviewing *de novo*
the motions for summary judgment filed, under the review
standard established for this intermediate court, we resolve to
confirm the appealed opinion to the fullest extent.

Let us see the relevant facts and the procedural route of the
case before our consideration.

**I**

On May 20, 2014, Mr. Samuel Ayala Otero filed a lawsuit for
defamation, libel, slander, the right to his own image, and
damages against Mr. Eduardo Rivera Nieves and the co-
defendants in the header, for having disseminated supposedly
defamatory information about his person. [4] He alleged that he
was a municipal police officer in the Municipality of Gurabo
and that he had a consensual relationship with Mr. Rivera
Nieves, which ended in February 2013. He argued that, after
the alleged intimidating behavior of Mr. Rivera Nieves against
him, he requested, *ex parte*, two protection orders for stalking,
which he was granted. [5]

He added in the lawsuit that Mr. Rivera Nieves filed two
lawsuits against him, one administrative and the other
criminal, based on false facts. [6] In addition, he offered "his
false and mendacious version" to the journalist Omar Matos
Figueroa, who, together with Mr. William Venegas Guzmán
and Editorial Televisa, published in the magazine *TV y
Novelas Puerto Rico* [7] a two-page article on the
aforementioned, without corroborating the veracity of that
information. He reported that a photograph of him was
included on the cover of the magazine that was published on
May 23, 2013, as well as inside it, without his authorization.

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 4 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

Mr. Ayala Otero alleged in his lawsuit that the alleged defamatory content was disseminated, on the same date, by the other defendants, through a radio program, *El relajo matutino,* [8] and another television program, *Dando candela.*[9] Finally, Mr. Ayala Otero argued in his claim that these events caused him to be hospitalized to receive treatment for major depression, and anxiety and panic attacks. He requested compensation amounting to $2,050,000.00. [10]

**\*2** All the defendants submitted their responsive arguments in a timely manner. [11] The parties then conducted an extensive investigation of the proof, including depositions and interrogations, and filed dispositive motions. [12] The Court of First Instance held an argumentative hearing on March 7, 2016 to discuss the respective requests for a summary judgment, which were submitted to its disposition that day.

On April 12, 2016, the court *a quo* issued the partial summary judgment appealed in which it dismissed with prejudice all the causes of action filed against all the defendants, *except those filed against Mr. Rivera Nieves and the claim for the right to his own image directed against Editorial Televisa and Messrs. Matos Figueroa and Venegas Guzmán.*

As indicated, the court of first instance left active the cause of action for the violation of image rights against Editorial Televisa Puerto Rico, Inc., Omar Matos Figueroa, and William Venegas Guzmán, an appeal that we deal with in recourse KLAN201600763.

Mr. Eduardo Rivera Nieves continues as a defendant in all the actions originally filed against him by Mr. Ayala Otero. He did not file a recourse in a timely manner before this court. Regarding him, the lawsuit in the case files continues its ordinary course.

Dissatisfied with the summary opinion, Mr. Ayala Otero asked the Court of First Instance to reconsider its decision, [13] which was denied. [14] In turn, Editorial Televisa Puerto Rico, Inc., Omar Matos Figueroa, and William Venegas Guzmán filed a motion for reconsideration, to achieve a partial revocation of the summary judgment regarding the cause of action related to image rights. [15] The court also did not accept this motion for partial reconsideration. [16]

These four litigants appealed the judgment before this intermediate court. In the KLAN201600735 case, Mr. Ayala Otero pointed out the following errors to the Court of First Instance:

> The honorable Court of First Instance erred in dismissing a lawsuit for damages for defamation, libel, and slander through the summary judgment mechanism, when there are essential disputes regarding the elements of the cause of action and when the credibility of the witnesses is in dispute.

> The honorable Court of First Instance erred in making determinations of fact that were disputed by the plaintiff by means of clear, robust, and convincing proof and in determining that elements of defamation cannot be proven under the standard of actual malice when there are admissions on the part of the co-defendants.

Mr. Ayala Otero accompanied his appeal with an urgent motion in aid of jurisdiction and requested the suspension of the proceedings under way before the court of first instance, particularly, the preliminary hearing that was scheduled for June 15, 2016. The appellee parties acquiesced to his stay request. By means of a resolution to that effect, on June 9, 2016, we declared the motion in aid of jurisdiction upheld and ordered the requested stay.

**\*3** As anticipated, on June 3, 2016, Editorial Televisa Puerto Rico, Inc. and Messrs. Matos Figueroa and Venegas Guzmán appeared in a joint appeal, case KLAN201600763, in which they indicated that the sentencing court made the following mistakes:

> The Court of First Instance erred in ruling that Editorial Televisa Puerto Rico, Inc., William Venegas, and Omar Matos had not put it in a position to adjudicate, through the summary judgment mechanism, the cause of action for violation of the right to one's own image, as recognized by Law 139 of 2011.

> The Court of First Instance erred in not dismissing the cause of action for the violation of the right to one's own image, as recognized by Law 139 of 2011 and determining that the image published by Editorial Televisa Puerto Rico, Inc. in the magazine TV y Novelas, May 27, 2013 issue, was included as part of a news report about a public interest dispute.

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 5 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

As they refer to the same judgment, both cases were consolidated. We instructed the appellant parties to file their respective briefs in opposition within reduced time limits, to give expeditious attention to the recourse, and they did so. The other appellee parties, Telemundo de Puerto Rico, Inc., ES Televisión Corp., Ms. Rivera, Mr. Fernández, Raad Broadcasting, Corp., Ms. Romero and Mr. Hernández, also appeared with separate allegations in opposition to recourse KLAN201600735.

With the benefit of these appearances, we proceed to review the pertinent doctrinal framework.

In part II, we will address the standards of review that are imposed on this appellate court when we review a summary judgment, particularly when, as in this case, the revised summary judgment deals with the issue of defamation. Then, in part III we will deal with the errors related to the action for defamation, with emphasis on the canon of actual malice; and in part IV, we will analyze the indications related to image rights.

## II

### -A-

Rule 36 of the Rules of Civil Procedure regulates the extraordinary and discretionary mechanism of the summary judgment. 32 L.P.R.A. [Leyes de Puerto Rico Anotadas (Laws of Puerto Rico Annotated)], App. V, R. 36. The main purpose of this procedural mechanism is to promote the fair, rapid, and economic solution of civil litigation that does not present genuine disputes of material facts, for which reason the plenary trial can be dispensed with. *S.L.G. Zapata Rivera vs. J.F. Montalvo,* 189 D.P.R. [Decisiones de Puerto Rico (Decisions of Puerto Rico)] 414, 430 (2013); *Melendez vs. M. Cuebas,* res. on May 21, 2015, 193 D.P.R. —— (2015), 2015 TSPR [Tribunal Supremo de Puerto Rico (Puerto Rico Supreme Court)] 70, on pgs. 8–9.

The petitioner must file a motion based on affidavits or any evidence that demonstrates the absence of a substantial dispute of relevant and pertinent facts about all or part of the claim. 32 L.P.R.A. App. V, R. 36.1. "A material (relevant) fact is one that may affect the outcome of the claim in accordance with the applicable substantive law." José A. Cuevas Segarra, *Tratado de Derecho Procesal Civil [Civil Procedure Law Treaty],* Volume III, 1041 (Pubs. J.T.S. [Jurisprudencia del Tribunal Supremo (Case law of the Supreme Court)] 2011). The dispute over the essential facts that the litigation generates

must be real, not speculative or abstract. Any doubt is not enough to deny the request for summary judgment. In other words, it has to be of a nature that "allows the conclusion that there is a real and substantial dispute over relevant and pertinent facts." *Ramos Perez vs. Univisión de P.R.,* 178 D.P.R. 200, 213–214 (2010), followed in *Meléndez vs. M. Cuebas,* 2015 TSPR 70, on pgs. 9–10. See also *Nieves Díaz vs. González Massas,* 178 D.P.R. 820, 848 (2010); *Commonwealth vs. Cole,* 164 D.P.R. 608, 625 (2005).

**\*4** When issuing summary judgment, the judge must: (1) analyze the documents that accompany the motion requesting summary judgment, those included with the motion in opposition and those that are in the judicial file and; (2) determine whether the opponent disputed any material facts or whether there are claims in the lawsuit that have not been disputed or refuted in any way by the documents. That is why the doctrine establishes that the petitioner has to establish his right clearly. If there are doubts about the existence of a factual dispute, these must be resolved against the petitioner, since this procedural mechanism does not allow the court to resolve issues of credibility. *Melendez vs. M. Cuebas,* 2015 TSPR 70, on pgs. 9–10. Also, *Mgmt. Adm. Servs. Corp. vs. Commonwealth,* 152 D.P.R. 599, 610 (2000); *Cuadrado Lugo vs. Santiago Rodríguez,* 126 D.P.R. 272, 279–280 (1990); *Corp. Presiding Bishop vs. Purcell,* 117 D.P.R. 714, 720 (1986).

Recently, the Supreme Court established the standard of review that this intermediate appellate court must use when reviewing denials or the granting of motions for summary judgment. It made it clear that this court's appellate review in such cases is *de novo.* That means that we have to determine which facts are undisputed and which remain in dispute. In any event, in determining whether if it is appropriate to summarily deliver a judgment, we must use the same criteria as the courts of first instance. In this task, we can only consider the documents that were presented before the court of first instance and those that are in the file. We must also check that both the request for summary judgment and the opposition filed meet the formal requirements established in Rule 36 of Civil Procedure, already cited.

Finally, we must review *de novo* whether the Court of First Instance correctly applied the Law to legal disputes that admitted disposition without holding a trial. *Melendez vs. M. Cuebas,* 2015 TSPR 70, on pgs. 20–21. Now, the High Court made it clear that the task of adjudicating the relevant and essential facts still in dispute corresponds solely to the court of

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 6 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

first instance in the exercise of its healthy discretion. *Vera Morales vs. Bravo Colón,* 161 D.P.R. 308, 334 (2004).

### -B-

In *Meléndez Vega vs. El Vocero*, the Supreme Court also established the review standard that governs the appellate courts in defamation cases. To this end, it stated that the appellate courts have the obligation to make "an independent evaluation" of the specific elements that make up that cause of action, for which they must carefully examine the judicial record. *Meléndez Vega vs. El Vocero,* 189 D.P.R. 123, 150 (2013).

**\*5** The objective of this analysis is to verify that the sentencing court did not incur in a *"forbidden intrusion in the field of freedom of expression"* of the defendant, protected by the first and fourteenth amendments of the federal Constitution and the Bill of Rights of the Constitution of Puerto Rico. This independent study, however, does not amount to a *de novo* review of the entire proof; it only refers to reviewing the portions of the file that are related to *the elements of proof required for each particular case. Id.,* on pg. 151. Likewise, the appellate court will defer to the credibility determinations of the witnesses made by the judge in the first instance, unless they are clearly erroneous. *Id.,* on pgs. 152–154.

Finally, for the defamation action to succeed, the plaintiff is required to show that the action imputed to the defendant caused real damages. The concept of damage has been defined as "the prejudice that a person suffers as a result of a specific occurrence or event, whether in their vital natural goods, or in their property or assets." *Galib Frangie vs. El Vocero,* 138 D.P.R. 560, 571 (1995). [17] It also refers to "the unfavorable behavior of the circumstances that, as a result of a specific event, occurs against the will of a person and that affects the legal assets that belong to him (personality, freedom, honor, assets)." *Id.* Of course, ordinarily, in lawsuits such as this one, the person harmed by the defamatory action is usually compensated for the injury caused to his reputation and relationships in the community and for other damages resulting from said action, such as moral damages and mental anguish. *Id.* on pg. 571–572.

On the other hand, in these cases, we cannot ignore another essential aspect of this type of civil action. In matters of non-contractual liability, in Puerto Rico, the theory of adequate causality governs. According to this, the adequate cause is the one that ordinarily produces the imputed damages, according to general experience. It is nothing other than the event or act that most likely could have caused the damage due to which the claim is made. The purpose of using proper cause as the guiding criterion in claiming compensation for damages is to limit the chain of civil liability and to prevent it from being extended to absurd limits. See, *Miranda vs. Commonwealth,* 137 D.P.R. 700, 707 (1994); *Negron Garcia vs. Noriega Ortiz,* 117 D.P.R. 570, 575 (1984).

In order to establish the causal relationship between the defamatory action and the alleged damages, the plaintiff must prove that the proper cause or producer of liability, that is, that which most likely caused the claimed damages, was the disclosure of the defamatory information by the defendant. Likewise, in these cases, it is necessary to determine whether the defendant could foresee that the disclosure of the contested information would cause the type of damage alleged by the plaintiff. *Colón, Ramírez vs. Televicentro de P.R.,* 175 D.P.R. 690, 707 (2009).

**\*6** With these introductory notes, let's address the errors raised in recourse KLAN201600735, regarding the action for defamation and the defense of actual malice.

### III

### -A-

Section 8 of Article II of the Constitution of the Commonwealth provides that "[e]very person has the right to the protection of the law against abusive attacks on his honor, his reputation, and his private or family life." Const. P.R., Art. II, § 8. This constitutional guarantee advocates the right to privacy of every natural person, which operates *ex proprio vigore* between private persons. *Castro vs. Tiendas Pitusa*, 159 D.P.R. 650, 658 (2003). This means that any individual can assert the right to privacy against individuals, without having to mediate a state action to invoke it. *Siaca vs. Bahia Beach Resort,* 2016 TSPR 11, 194 D.P.R.——, on pg. 35. The aggrieved party only has to file a lawsuit for damages and demand in court both the immediate cessation of any violation of their right to privacy, as well as compensation for the damage caused. *Id.,* pg. 31.

The aforementioned constitutional provision, then, protects a citizen against defamation, which has been defined as the discrediting of a person by publishing "things against his reputation," which includes the modalities of libel and slander. *Pérez Rosado vs. El Vocero,* 149 D.P.R. 427, 441 (1999).

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 7 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

Protection against defamatory expressions has its origin in the Law of February 19, 1902, which established the action for libel and slander. 32 L.P.R.A. § 3141, *et seq.*[18] However, as anticipated, Article 1802 of the Civil Code of Puerto Rico "is the source of civil protection against defamatory attacks in our jurisdiction." 31 L.P.R.A. § 5141; *Colon, Ramirez vs. Televicentro de P.R.,* 175 D.P.R., on pg. 712.

It should be noted, however, that the action that seeks to defend a person's right to privacy, ordinarily, is opposed to the exercise of the fundamental rights of freedom of expression or freedom of the press, also recognized with equal prominence in Section 4 of Article II of the Constitution of Puerto Rico: "No law will be passed that restricts freedom of speech or the press or the right of the people to meet in peaceful assembly and to ask the government to redress grievances."

This confrontation has generated the development of different standards and criteria to manage the balance of conflicting interests in this type of action, according to the people involved or the aggrieved interests. See *Porto and Siurano vs. Bentley P.R. Inc.,* 132 D.P.R. 331, 343 (1992); *Mendez Arrocho vs. El Vocero de P.R.,* 130 D.P.R. 867, 876 (1992).

Let us analyze these standards and criteria separately: first, those that refer to the parties involved, then, those related to the information and its public handling by the defendant.

-B-

**\*7** The constituent elements of the cause of action for defamation will depend, in the first place, on whether the plaintiff is a private person or a public figure. When they are a *private person,* it is necessary for them to allege and prove three essential requirements for their claim for damages for defamation to succeed: (1) that the information is defamatory and false; (2) that the publication was made negligently, and (3) that they suffered actual harm from such representations. *Perez Rosado vs. El Vocero de Puerto Rico,* 149 D.P.R., on pg. 442; *Villanueva vs. Hernández Class,* 128 D.P.R. 618, 642 (1991).

Negligence or the degree of fault required to impute liability for defamation has been defined as "the lack of due care, which in turn consists of not anticipating and foreseeing the rational consequences of an act, or the omission of an act, which a prudent person would have to foresee under the same circumstances." *Colon, Ramirez vs. Televicentro de P.R.,* 175 D.P.R., on pgs. 706–707; *Ramos vs. Carlo,* 85 D.P.R. 353, 358 (1962).

The criteria for determining whether the defendant engaged in negligent conduct are: (1) the nature of the information published and the importance of the matter it deals with, especially if the information is libelous on its face; (2) the origin of the information and the reliability of its source; (3) the reasonableness of the verification of the veracity of the information obtained, whose determination is carried out by considering the cost in terms of money, the personnel involved, the urgency of the publication, the nature of the news, and any other pertinent factor. However, it should be considered, as *the guiding criterion* in these cases, whether "the defendant could foresee that his action or omission could cause some damage." *Colon, Ramirez vs. Televicentro de P.R.,* 175 D.P.R., on pg. 707.

On the other hand, when the plaintiff is *a public figure,* the evidentiary standard to prevail in a defamation action is much more onerous. [19] As in the case of a private person, a public figure has to prove the falsity of the information and the damages suffered. However, instead of negligence, it is necessary to show that the defendant acted with *actual malice,* i.e. *knowing that what was said about the plaintiff was false or with gross disregard for the truth.* *Garib Bazain vs. Clavell,* 135 D.P.R. 475 (1994); *Méndez Arocho vs. El Vocero,* 130 D.P.R. 867, 878 (1992), which follow the doctrine established in *New York Times vs. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). [20]

Regarding this case, the parties stipulated that, since Mr. Ayala Otero was a municipal police officer, the criterion of actual malice was applied to the defendants. And it was so because the Supreme Court of Puerto Rico expressly resolved in the case *Soc. de Gananciales vs. López,* 116 D.P.R. 112, 116 (1985), that agents of public order or "policemen," *are considered public officials for the purposes of applying the doctrine of actual malice to them.* In this case, the Supreme Court, through the voice of the Presiding Judge Trías Monge, stated:

Case 4:21-cv-00335-RGE-SBJ Document 24-4 Filed 03/28/22 Page 8 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

**\*8** The reputation of police officers, as well as that of other public officials and employees, is not at the mercy of any kind of attack, more so in the present circumstances, the interest in the free flow of information about the conduct of an employee of such critical importance to the public welfare clearly prevails, over other considerations, with the brake that represents the doctrine of actual malice.

*Id.,* 116 D.P.R., on pg. 116. See also *Maldonado vs. Marrero Padilla,* 121 D.P.R. 705, 714 (1988).

Now, actual malice is never presumed. *Garib Bazain vs. Clavell,* 135 D.P.R., on pg. 484. Furthermore, "even proof of ill will or hatred does not by itself satisfy the constitutionally required degree of the proof of malice." *Id.,* on pgs. 484–485; *Garcia Cruz vs. El Mundo, Inc.,* 108 D.P.R. 174, 181 (1978). Likewise, *serious disregard* is not measured by what a prudent and reasonable man would have published or investigated; it has to be shown that the defendant had *serious doubts about the accuracy of the allegedly defamatory information. Garib Bazain vs. Clavell,* 135 D.P.R. on pg. 485.

The standard of proof in these cases is more rigorous than the preponderance of the proof; clear, robust, and convincing evidence is required. *Meléndez Vega vs. El Vocero,* 189 D.P.R., on pg. 149. Although there is no exact definition, clear, robust and convincing proof has been described as "[proof] that produces, in an adjudicator of facts, a lasting conviction that factual contentions are highly probable." *In re Ruiz Rivera,* 168 D.P.R. 246, 253 (2006). This is evidence that is stronger than a preponderance of the proof, but weaker than proof beyond a reasonable doubt; *In re Rodríguez Mercado,* 165 D.P.R. 630, 641 (2005).

Anyway, from *New York Times Co. vs. Sullivan,* a public official can only sue for defamation if he proves the defendant's "actual malice" in making the defamatory allegations, by direct or circumstantial proof. The rationale for this criterion is that the public figure's right to privacy "weighs less" than the right of other citizens to free expression, unless the expressing parties are shown to have actual malice. José Julián Álvarez González, *Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos* 1004 [*Constitutional Law of Puerto Rico and constitutional relations with the United States* 1004] (Temis 2009); *Garib*

*Bazain vs. Clavell,* 135 D.P.R., on pg. 483; *Melendez Vega vs. El Vocero,* 189 D.P.R., on pg. 148, approvingly citing *Harte–Hanks Communications vs. Connaughton,* 491 US 657, 667–668, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1988). [21]

-C-

In the indispensable exercise of harmonizing the fundamental rights confronted in an action for defamation, especially against the media or "the press," different theories or defenses have been developed to protect and justify the expression that may cause any person injury, discomfort, or embarrassment. See Álvarez González, *Op. Cit.,* on pgs. 996–1034. And this judicial dynamic, known as the "categorical method," based on rules or doctrines that predetermine the criteria that the judge must consider in resolving a case, has been justified as follows:

**\*9** The categorical method prevails in the arena of defamation. This is stated, for example, by the Supreme Court of the United States in several of its core opinions. Certainly, said court has opined that the development of some concepts, such as serious disregard for the truth, can only be achieved on a case-by-case basis. But **its goal has been to elucidate the content of legal concepts, since this search is particularly important in the field of freedom of expression, given that, "[u]ncertainty as to the scope of the constitutional protection can only dissuade protected speech—the more elusive the standard, the less protection it affords."** A careful review of our modern defamation jurisprudence also reveals that the prevailing trend has been to seek rule making rather than *ad hoc* adjudication.

[ ... ]

In addition to the broad legal authority that supports it, the categorical method turns out to be the most appropriate, especially in the case of expressions about the management of a public official. The close link between democracy and deliberation demands no less. **We must remember that one of the main purposes of the regulations in this field is to avoid the dissuasive effect that the law could have on free expression in matters of public interest.** This requires, among other things, that citizens have a reasonable degree of certainty regarding the meaning of the relevant legal concepts, as well as their procedural consequences. The infinite casuistic relaxation of concepts, the transmutation of the actually malicious person into a

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 9 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

kind of prudent and reasonable person, adds little to this certainty.

See the agreeing opinion issued by associate judge Rodríguez Rodríguez, joined by presiding judge, Mr. Hernández Denton in *Cabrero vs. Zayas,* 167 D.P.R. 766, 769–792 (2006). (Quotes omitted).

For example, based on this categorical approach, the Supreme Court of Puerto Rico adopted the doctrines of "opinion" and "rhetorical hyperbole" as defenses in cases in which the right to freedom of expression and press are proposed in *Garib Bazain vs. Clavell,* 135 D.P.R., on pgs. 489–490. It defined the first as an expression on issues of public interest that does not contain a factual connotation that is likely to be proven false. That is, expressions that cannot be reasonably interpreted as expressing real facts are protected. *Id.* "Rhetorical hyperbole" constitutes an expression that is allegedly defamatory, but that is not actionable if it is used in a figurative, flexible sense and not necessarily for its literal meaning. *Id.,* pgs. 485–486.

The "fair and true report" and "impartial comment" doctrines were also adopted in *Villanueva vs. Hernández,* 128 D.P.R. 618 (1991); and in *Porto and Siurano vs. Bentley PR Inc.,* 132 D.P.R. 331 (1992), upheld the conditional immunity doctrine on "business communications" in the labor context.

**\*10** The doctrinal framework that interests us on this occasion is that of "logical and reasonable inference," expressed under the protection of the exercise of freedom of expression and in the context of the discussion generated around matters of public interest. Let's look at its foundations.

Regarding the extension of the right to freedom of expression or speech, the need and importance of "robust and open debate on public affairs" has been reiterated, which can "include vehement, caustic, and sometimes unpleasantly cutting attacks." *Garib Bazain vs. Clavell,*135 D.P.R. on pg. 485; *Sociedad Legal de Gananciales vs. López [Community Ownership of Property vs. López],* 116 D.P.R., on pg. 115. Furthermore, freedom of expression has been equated with freedom of the press, so that both true and incorrect information regarding matters of public interest are protected, since erroneous expressions are an inevitable part of the discussion of public issues. This interpretation serves the purpose of "maintaining an open climate for the frank and vigorous discussion of matters of public interest and of the conduct and performance of public officials." *Garib Bazain vs. Clavell,* 135 D.P.R. on pg. 485; *Torres Silva vs. El Mundo,*

*Inc.,* 106 D.P.R. on pg. 436; *Oliveras vs. Paniagua Diez,* 115 D.P.R. 257, 268 (1984).

In *Bosch vs. Editorial el Imparcial, Inc.,* 87 D.P.R. 285, 309 (1964), the Supreme Court of Puerto Rico stated, regarding the case in which a person makes some inference about particular facts, that a comment may be harsh and scathing without constituting defamation "provided it is based on facts or such inferences from facts as, in the judgment of a reasonable person, constitutes a fair assessment of a situation." [22]

In short, the inferences or conclusions that a person may reach *about matters of high public interest or regarding the actions of a public official,* even when it is proven that they were made with will or hatred, are not sufficient to constitute actual malice as evidence in this case. *Garib Bazain vs. Clavell,* 135 D.P.R. on pgs. 484–485; *Garcia Cruz vs. El Mundo, Inc.,* 108 D.P.R. 174, 181 (1978). And this doctrine has a clear purpose: the defense of the free flow of ideas that nourishes the democratic system in a free society. [23]

In short, when a person makes inferences based on information that is in their hands, both the true and the incorrect information is protected, if they are matters of public interest, since erroneous expressions are an inevitable part of the discussion of such matters. *Oliveras vs. Paniagua Diez,* 115 D.P.R. on pg. 268; *Garib Bazain vs. Clavell,* 135 D.P.R. on pg. 485.

Let's apply these rules to the indications of recourse KLAN201600735.

-D-

**\*11** When evaluating the relevant proof of the present case, we not only have to examine *de novo* the motions for summary judgment and their respective oppositions, as established in the case of *Melendez vs. M. Cuebas, ante,* we also have to apply the review standard for defamation cases stated in *Meléndez Vega vs. El Vocero,* already cited. And this is so, because the determination that there was "*actual malice with convincing clarity*" is "*a constitutional fact*" that imposes an independent judicial review by the appellate court. *Bose Corp. vs. Consumers Union of United States, Inc.,* 466 US 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); C. Thomas Dienes, *Appellate Review of Actual Malice,* 10 Comm. Law. 3 (1992–1993). [24]

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 10 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

Of course, we cannot rule out the findings of fact of the court appealed against and conclusions of law if they find support in the proof that both courts have examined. To see if it is appropriate to accept such determinations and conclusions as correct, a brief summary of the facts that the Court of First Instance considered proven is necessary.

-i-

In the appealed judgment, after determining that Mr. Ayala Otero, as a municipal police officer, had to be considered a public official, for the purposes of applying the scrutiny of actual malice to the people and the media sued for defamation, the court *a quo* concluded that, in his motion for summary judgment, Mr. Ayala Otero did not present admissible proof that met that evidentiary standard. Although Mr. Ayala Otero presented documents to show that the administrative and criminal complaints filed against him by Mr. Rivera Nieves were unsuccessful, which, in his opinion, was proof of the falsity of what was published, the court concluded that the defendants refuted his argument that they did not corroborate the veracity of the information and that they published it with a clear disregard for the truth.

The judge reasoned that the only person with whom the media could corroborate the allegedly slanderous statements was with Mr. Ayala Otero himself, since there were no eyewitnesses, and he was not available to do so. It determined as a proven fact that Mr. Matos Figueroa tried to communicate with Mr. Ayala Otero, to listen to his version, but he was not at work, so he left a message that was not answered. The journalist also unsuccessfully tried to receive a response from the investigators of the administrative case, who confirmed the existence of the process, but never responded to his requests for information. After the broadcast of the interview with Mr. Rivera Nieves, Mr. Fernández Rivera offered Mr. Ayala to contact the Dando Candela program, but he did not do so either.

**\*12** In its analysis, the court of first instance gave weight to the fact that, at the time the disputed expressions were published, Mr. Rivera Nieves had filed the two aforementioned complaints against Mr. Ayala Otero, one administrative before the Municipal Police and another criminal before the Puerto Rico Police, which were in the process of investigation. It stated that, even if they had tried, it was very unlikely that the defendant media would have access to the file of the administrative investigation or the prosecutor's summary. In fact, it determined that "[it] was not until July 5, 2013 that the prosecution instructed the Puerto Rico Police not to file criminal charges against Ayala Otero." For this reason, the court *a quo* concluded that Mr. Ayala Otero did not provide proof that would allow him to determine what other information the defendants could have obtained, *when they became aware of the information,* which would deny the allegations of Mr. Rivera Nieves.

Finally, after assessing the proof presented by the parties in their respective motions for summary judgment, the Court of First Instance ruled that Mr. Ayala Otero did not demonstrate that the defendant communications media acted with actual malice by publishing the interviews they conducted with Mr. Rivera Nieves. The court *a quo* clarified that, even if it considered Mr. Ayala Otero a private person, he also did not demonstrate that the defendant media acted negligently when processing and disclosing information that was of public interest.

-ii-

Before discharging our reviewing responsibility, through the examination *de novo* of the documents that are in the file, we want to make an important point as an introduction to that analysis. Mr. Ayala Otero points out in his appeal that the originator of the information is equally responsible for defamation, *if it is false,* as is the media outlet that repeats or discloses it without prior corroboration, with clear disregard for the truth. However, appellant Ayala Otero forgets that, by applying the canon of actual malice, the defendant will not be liable for defamation, *even if the information is false,* if the specific case goes through the crucible of indicated categorical method, that is, if there prevails in the outlined defenses: the "fair and true report," the "impartial comment," the "business communications" in the labor context, the "logical and reasonable inference," among others that we have mentioned above. Whether what Mr. Rivera Nieves said was true or not, is not something that should weigh on the analysis regarding the media outlets sued in this case. What matters in this scrutiny is whether the information was of public interest and

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 11 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

*whether it was published in accordance with the canons described,* after submitting the question to the indicated "categorical method."

**\*13** With that caveat, as an appellate court, we conclude that the proof presented by both parties, together with the motions for summary judgment and their respective oppositions, support the factual determinations of the sentencing court, as well as the conclusions of right that cleared the defendants ES Televisión Corp., Telemundo Of Puerto Rico Inc., Leo Fernández III, Saudy Rivera, Raad Broadcasting Corp, Diosdada Romero, Tomás Ramos, t/c/c Red Shadow, Editorial Televisa–Puerto Rico, h/n/c Revista TV y Novelas of Puerto Rico, Omar Matos Figueroa, and William Venegas Guzmán of liability for defamation.

In endorsing the findings of fact of the court appealed against, we confirm that Mr. Ayala Otero did not prove that these defendants acted with "actual malice" or serious disregard for the truth, because they harbored serious doubts about the veracity of what was reported by Mr. Rivera Nieves, that is, on the facts that generate the demand.

Regarding Editorial Televisa–Puerto Rico, Omar Matos Figueroa, and William Venegas Guzmán, we highlight that they were the first to disclose the information in question and they did so in writing. Hundreds of pages of depositions are in the records in which it is explained under oath how Mr. Matos Figueroa learned the information directly from Mr. Rivera Nieves, an actor in the human drama that they reported in the magazine for which the former works. It is also explained that his superiors decided to publish this material, because it was of social interest, due to involving a public official. It is also explained that steps were taken to corroborate the information with Mr. Ayala Otero himself, but he was not available to give his version of the events. Mr. Matos Figueroa testified that he took steps to obtain information on the complaints filed against Mr. Ayala Otero, without success.

There are copies of the complaints, of the investigation reports and their findings, of the results of judicial processes in the records, which show that there was some reliability to the original story. Of course, these are documents and processes that are confidential at an early stage, so the press would not necessarily have timely access to them. Although the complaints were later dismissed, the truth is that this information was not available when the editorial or executive decision to publish or disclose it was made.

In evaluating the content of the post, to see if it denotes actual malice that imposes liability, we highlight the following. The article is preceded by the following paragraph:

Drowning in tears, the Arecibo line guard Eduardo Rivera Nieves, 47 years old, spoke for the first time of the horrendous nightmare that, presumably, he was part of with the Gurabo Municipal Police officer, Samuel Ayala Otero.

Then follows the list of questions and answers:

**\*14** *Eduardo, what do you want to denounce publicly?*

A sexual assault by a municipal police officer from the Gurabo area by the name of Samuel Ayala Otero and whose badge is 28XX.

*What kind of relationship do you have with him?*

We had a relationship as a couple for about six months... We left each other four months ago (on January 3, 2013).

*How did you meet him?*

Through Facebook; he was the one who contacted me... Throughout the romantic relationship, I discovered, through calls and text messages, that there was a third person... He was unfaithful to me with a Capitol employee.

*What was that relationship like?*

Those five months were the worst of my life, because I received a lot of emotional abuse as a result of his infidelity with different people.

[ ... ]

*Why were you still with him?*

Maybe because I felt alone or because I thought that he was going to change... However, he threatened to kill me. Told me: 'In my gun and in my belt, there is a bullet with your name on it...' I was afraid of him.

*How was the sex life between you?*

It was normal... But he was escalating sharply in his sexual attitude towards me... After each sexual intercourse, he behaved more abruptly or aggressively... On several occasions, in the middle of his work shift, we had sex... Once we were together in the same patrol car (in the

Case 4:21-cv-00335-RGE-SBJ    Document 24-4    Filed 03/28/22    Page 12 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

afternoon and near the Gurabo city hall). It was a fantasy come true for him.

[ ... ]

**What exactly is your complaint?**

He sexually assaulted me on January 3, 2013... My having sex with him was not consented to by me.

[ ... ]

*Where and how did the rape you speak of occur?*

In a motel in Caguas, where he tricked me into going, supposedly to talk about us and dressed as a police officer... He sodomized me at about 11:30 at night, approximately... There he grabbed me by the arms. I was face down and almost suffocating with the pillow, he lowered my underpants, he raised my arms completely and, finally, he penetrated me without a condom... He didn't let me go until the act was over... I bled a lot!

[ ... ]

**Do you have any lawsuit against him?**

**There are some administrative complaints filed in the Municipal Barracks of Gurabo and the filing of the case for sexual assault is still pending in the Court of Caguas.**

Our emphasis. Revista TV y Novelas, App. of the case KLAN201600573, pgs. 673–675.

From the analysis of the *content of the article* and of *the manner in which the allegedly defamatory information was disclosed*, we agree with the Court of First Instance that they do not reveal actual malice and a clear disregard for the truth. There are important behavioral elements that protect the freedom of speech or press of these defendant parties. On the one hand, Mr. Rivera Nieves went to the media to "denounce" the behavior or "aggression" to which he was allegedly subjected by a public official, which puts on Mr. Rivera Nieves the weight of having generated the information and of making it available to the media. The published material followed the format of questions and answers, that is, Mr. Rivera Nieves, as the complainant, answered what the journalist wanted to emphasize in the story that he started. Mr. Rivera Nieves admitted that he was the one who contacted Mr. Matos Figueroa to tell him the story. Although there are elements in the story that could "feed the fascination" of people, the truth

is that there was information in that story that could be of genuine public interest. As we have already pointed out, the defenses of "fair and true report," "impartial comment," or "logical and reasonable inference," on matters of high public interest or on the actions of a public official, serve as a shield in this case to the imputation of actual malice or clear disregard for the truth regarding Editorial Televisa, Omar Matos Figueroa, and William Venegas Guzmán. It is appropriate to confirm the judgment appealed regarding the dismissal of the action for defamation against these defendant parties.

-iii-

**\*15** Let's analyze the proof involving the other defendants.

From the documentary proof that we have carefully evaluated, it appears that ES Televisión Corp., Telemundo Of Puerto Rico Inc., Leo Fernández III, Saudy Rivera, Raad Broadcasting Corp, Diosdada Romero, Tomás Ramos, t/c/c Red Shadow expressly informed the public that they *only repeated* what had already been published in *TV y Novelas,* and was newsworthy for the truth regarding Editorial Televisa, Omar Matos listeners.

We transcribed *some* segments of the program *Dando candela,* in order to demonstrate that what was broadcast was already news, that is, it turned out to be a repetition of the article published in *TV y Novelas:*

> MS. SAUDY RIVERA: There is a situation happening right now, gentlemen, it's a love triangle. You're really listening to me, right? A love triangle between a police officer, an Electric Power guard, and an employee of the Capitol.

[ ... ]

[*Change of camera shots.*]

> MR. LEO FERNANDEZ: You are going through a very difficult situation, because in your life, you had a relationship that did not end well.

> MR. EDUARDO RIVERA NIEVES: That's right. That's right, a... with another person of the same sex.

> MR. LEO FERNANDEZ: In that... In that type of relationship, **were you dating a police officer, a municipal police officer?**

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 13 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

MR. EDUARDO RIVERA NIEVES: That's right, *a municipal police officer from the Gurabo area.*

MR. LEO FERNANDEZ: And was it a love relationship?

MR. EDUARDO RIVERA NIEVES: That's right.

MR. LEO FERNANDEZ: How did you meet each other?

MR. EDUARDO RIVERA NIEVES: We met through communications on Facebook.

MR. LEO FERNANDEZ: You guys had an incident at a motel, too.

MR. EDUARDO RIVERA NIEVES: That's right. That's the worst part, the bitter pill, which, please will excuse me if it makes me emotional, because, to all this, he is using all... all his... contacts, all the people he has around him to manipulate, to gain stalking orders against me. In all this, I have been the victim. He was watching in a building, in a building, this... municipal [sic] and I asked him if he would let me go to the bathroom, because he was watching that place. When I go into the bathroom, I try to go into the bathroom, he... he takes me to the bathroom, I go in with him, he tells me: "Well, the urinals are there." When I'm there, he tries to get me to do something with him in there, he pulls down my pants and tries to struggle with me, and I... I quickly got out of the bathroom and I left. I told him: "No, you can't do that there. No, take it easy. We'll go to a place and... and, well, to a place where we can have privacy."

**\*16** MR. LEO FERNANDEZ: Before, had you been intimate?

MR. EDUARDO RIVERA NIEVES: Correct, yes.

MR. LEO FERNANDEZ: In public places, in motels?

MR. EDUARDO RIVERA NIEVES: No, negative. In public places, yes, it happened in a patrol car, too.

MR. LEO FERNANDEZ: I mean, did you make love to him in a patrol car?

MR. EDUARDO RIVERA NIEVES: There was oral sex in a patrol car.

MR. LEO FERNANDEZ: Was he driving or was he parked somewhere?

MR. EDUARDO RIVERA NIEVES: No, parked in one spot.

MR. LEO FERNANDEZ: In that spot, of that municipal building, did you meet to see each other in a more private place?

MR. EDUARDO RIVERA NIEVES: That's right. I, I mean, I was kind of uncomfortable and I wanted to talk to him (unintelligible). "No, we're going to the same place as always," well, I agreed. We went to the motel. When we got there, I sat him down and told him: "Look, I have to talk to you. I didn't like the way you acted today and tried to forcefully grab me by the arm, and you know I don't like those things." He got upset: "Oh, I don't want to talk about that, I came here for other things." He came and fucked, and lay down. He said: "Oh, I'm going to go to lie down and sleep." He fucked and lay down to sleep in bed, and I was a little annoyed with all this, I went and took a bath, I lay down next to him. I have sleep apnea and, um, I lay on my stomach in my *boxers*. When I fall sound asleep, he jumps on me with his service weapon, he throws the service weapon on the table next to him, on the side table, for me to see.

MR. LEO FERNANDEZ: To intimidate you.

MR. EDUARDO RIVERA NIEVES: That's what I understand. Yes, I feared for my life at that moment. He presses my head against the pillow, as if he were to suffocate me, he gets up on my back, as you can see right now, I have... I had disc surgery, that's a... a condition that I have had for years after a fall.

MR. LEO FERNANDEZ: And he... and he knew that?

MR. EDUARDO RIVERA NIEVES: And he knew that. And he grabs me by the arms, very firmly, and there, he...

MR. LEO FERNANDEZ: Does he penetrate you, sodo... sodomize you?

MR. EDUARDO RIVERA NIEVES: Correct. He threatened to kill me, too. He said that, in his belt and in his revolver, he had a bullet with my name on it.

MR. LEO FERNANDEZ: Eduardo, Samuel must be watching you on television, what do you say to him?

MR. EDUARDO RIVERA NIEVES: I tell Samuel, I know that there is a... stalking order, but he knows what

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 14 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

happened, and if you have any heart, and you feel as macho as you say you are, speak the truth and tell the truth, and don't make me suffer anymore. Tell us what happened and don't keep hiding behind your friends, and behind the people who protect you, because they are that, and only God knows.

Maybe you could escape the... the justice of men, but God's, you know that you're not going to escape, and you know that this really happened, and I attest to that, and God is my only witness. **\*17** MR. LEO FERNANDEZ: Have you tried to take your life?

MR. EDUARDO RIVERA NIEVES: On two occasions.

MR. LEO FERNANDEZ: We are going to try to get help for our friend Eduardo. *Of course, Samuel also gets a chance to tell his side of this. We have been very careful in how we deal with the issue* and we thank Eduardo, his family, his mother is here, who have trusted Omar, "Deddie" and "Red," who also worked on the matter, and Dando Candela. We continue.

MS. SAUDY RIVERA: Look, my brother, just for you to see, appearances are deceiving. A big, handsome man, going through a difficult situation with a man, look, a person of the same sex, who alleges he raped him, being a police officer and using, look, his regulation weapon. Listen, that cries before the eyes of God.

MR. FERNAN VELEZ: And I'm told that this gentleman who spoke on camera is allegedly in fear for his life. So try to imagine. [ ... ]

MR. FERNAN VELEZ: *Well, this... this story came out in the most recent edition of Revista TV y Novelas Puerto Rico.*

MS. SAUDY RIVERA: *We cleared that up, right.*

MR. FERNAN VELEZ: Obviously, we are giving here the scoop on television so that you could find out and hear these gentlemen talking with their own mouths, in this case, that I speak here on camera, okay?

MS. SAUDY RIVERA: And to this man, who is asking for help, gentlemen. *Our cameras are for everyone who definitely needs it, gentlemen.*

[SEGMENT END]

Our emphasis. Dando candela, App. of the case KLAN201600573, pgs. 664–671.

On the radio program *El relajo matutino,* enlivened by Mr. Ramos and Mrs. Romero, Mr. Matos Figueroa, and Mr. Rivera Nieves, from the Capitol, joined the broadcast. As happened in *Dando candela,* the radio journalists interviewed Mr. Rivera Nieves, who answered questions related to the same allegations that he narrated for the written publication. They read the text messages and, as in the publication, the latter alluded to two suicide attempts, after the alleged sexual assault. The name of Mr. Ayala Otero was mentioned on the air, as well as the fact that he was a municipal police officer from Gurabo. At the end of the broadcast, Mr. Matos Figueroa invited the appellant here, Ayala Otero, to communicate with him to make any statement about what was disclosed there.

Note that, in addition to noting that this material was already known, due to its previous publication in the magazine *TV y Novelas,* both the program *Dando candela* and *El relajo matutino* lent their airwaves to repeat the story that Mr. Rivera Nieves took to the magazine. Nor has Mr. Ayala Otero shown that these media outlets and their representatives acted with actual malice, that is, with a clear disregard for the truth because they harbored serious doubts about the veracity of the information provided by Mr. Rivera Nieves and still disclosed it. Public interest had already been generated in what was reproduced in this way, since it was about the questionable behavior of a public official on the premises he was in charge of or on State property, such as the patrol car assigned to him.

**\*18** We resolve that it is appropriate to confirm the appealed summary judgment that dismissed the defamation action brought against the defendants ES Televisión Corp., Telemundo Of Puerto Rico Inc., Leo Fernández III, Saudy Rivera, Raad Broadcasting Corp, Diosdada Romero, and Tomás Ramos, t/c/c Red Shadow.

**IV**

Let us now address the issues raised in the recourse KLA201600763 on the cause of action for violation of the right to one's own image.

**-A-**

The Court of First Instance understood that Mr. Ayala Otero's lawsuit contains allegations that could constitute a claim that justifies the granting of a remedy provided by Law No. 139–2011. Regarding this claim, it resolved:

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 15 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

[ ... ] However, regarding Editorial Televisa Puerto Rico, Inc., Omar Matos Figueroa, and William Venegas, this Partial Judgment does not dispose of all the claims filed against them. Note that, in paragraph 30 of his Amended Lawsuit of September 10, 2014, Ayala Otero maintains that Editorial Televisa Puerto Rico, Inc., Omar Matos Figueroa, and William Venegas published photos of "his image without his consent and in order to sell more magazines"; this in violation of his right to his own image recognized by Law Number 139 of July 13, 2011. The parties have not put this Court in a position to adjudicate, through the summary judgment mechanism, said cause of action.

The appellants in this recourse argue that the Court of First Instance erred "by not dismissing the cause of action for violation of the right to one's own image, as recognized by Law 139 of 2011" and "[by not] determining that the image published by Editorial Televisa Puerto Rico, Inc. in Revista TV y Novelas, edition of May 27, 2013, was included as part of a news report on a dispute of public interest." Consequently, they also argue that the sentencing court erred in concluding that "they had not put him in a position to adjudicate, through the summary judgment mechanism, the cause of action for the violation of the right to one's own image, as recognized by Law 139 of 2011."

Let us address both points together.

-B-

The right to one's own image is an issue that is under development in the Puerto Rican legal system. Until *Vigoreaux Lorenzana vs. Quizno's Sub,* the only careful consideration of the constitutional protection of commercial expression in Puerto Rico had been given in the context of attorneys' advertisements. Álvarez González, *Op, Cit.,* on pg. 1052. However, through case law, in Puerto Rico, it was established as a customary law that every person can control where, when, and how a photograph is taken or their image is reproduced in any way, as long as they are not an accessory figure. *Vigoreaux Lorenzana vs. Quizno's Sub,* 173 D.P.R. 254, 263 (2008).

**\*19** In general, the image constitutes a projection or representation of the human figure. In this regard, the High Court resolved that "[one's] image constitutes a fundamental attribute with which a person is socially individualized; that is, it is part of their personal identity. As such, it is worthy of protection due to its close relationship with the intimacy of the person as well as with their honor." *López Tristani vs. Maldondado,* 168 D.P.R. 838, 851 (2006). Then, in the opinion of *Vigoreaux Lorenzana vs. Quizno's* the Supreme Court of Puerto Rico, reiterated that the right to one's own image is an aspect of the right to privacy. Regarding this detail, it stated:

> By virtue of this right, any person may oppose the reproduction of their effigy or the obtaining of photographic proof thereof, by persons to whom they have not granted express or tacit authorization [ ... ]. The authorization to take a photograph does not include the authorization to publish it, since the publication affects the personality of the interested party more intensely than the simple fact of photographing him. The authorization to be published may include some limitation whose scope will be determined according to the interpretation of the specific case.

*Vigoreaux Lorenzana vs. Quizno's,* 173 D.P.R., on pg. 264, citing J. Santos Briz, *El derecho de daños* [The law of damages] 178–179 (Ed. Revs. Der Privs. 1963).

In turn, the same opinion recognized the existence of several defenses against this cause of action, noting that there is considered admissible, without prejudice to other justification, the publication or taking of photographs in the area called "contemporary history," not referring to private life, or when they reproduce meetings, demonstrations, or other similar public acts or public events or locations in which the person photographed is an accessory figure. *Vigoreaux Lorenzana vs. Quizno's Sub,* 173 D.P.R., on pg. 264. In addition, in such pronouncements, the Supreme Court concluded that the publication of photographs taken without the request of the interested party is allowed when justified by a public interest or a serious artistic interest, or when the constitutional right to freedom of expression of the defendant prevails over the interests of the photographed subject. *Id.,* citing *Luis Dí ez-Picazo & A. Gullón Ballesteros, Sistema de Derecho Civil [Civil Law System]* 377 (Tecnos 1992).

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 16 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

In accordance with the foregoing, the High Court established as a rule that any injury to the personality is unlawful, unless there is a justifying reason or the consent of the affected party, or that the act is considered socially appropriate, because it is in accordance with law, in attention to the social ethical ordering of community life. *Vigoreaux Lorenzana vs. Quizno's Sub,* 173 D.P.R., on pg. 265; *Colón vs. Romero Barceló,* 112 D.P.R. 573, 578 (1982).

**\*20** Now, in *Vigoreaux Lorenzana vs. Quizno's Sub,* the Supreme Court recognized that the right to one's own image in other jurisdictions is not limited to being an aspect derived from the right to privacy. The prevailing current trend, both in Civil Law and in *Common Law,* is the recognition of image protection as an independent right. This right grants its owner the power *erga omnes* to exclude the reproduction and publication of the image itself by a third party who lacks consent to do so, giving rise to the non-contractual liability of the person who thus publishes and reproduces it.

On the other hand, civil law doctrine has argued that image rights constitute more of a property right than a personality right. This is the view that has also been adopted by federal case law and by a large part of the U.S. States, under the figure of the "right of publicity." [25] Under this property protection, which is characterized as an intellectual property right, the subject has the right to participate economically in the commercialization of his own image, name, or likeness. F. Igartúa Arregui, *The commercial appropriation of the image and names of others* 76–98 (Tecnos 1991).

Regarding this peculiarity, the Supreme Court of Puerto Rico points out that, although it can be said that the economic value of a person's image is of an intangible nature, it may have a commercial or advertising value that responds to the particular characteristics and efforts of the person in a certain area. For such purposes, the doctrine suggests that, in these cases, there are economic damages as a result of a decrease in income that could have been obtained by the consented participation of the individual in the market; or because of an unjust enrichment from which he has obtained benefits at the expense of the characteristics of the identity of another person, without compensating him for it. *Vigoreaux Lorenzana vs. Quizno's Sub,* 173 D.P.R., on pg. 267, no. 8.

It is also stated that the unauthorized use of a person's image for commercial purposes, without their consent or remuneration, generally gives rise to a cause of action for damages, caused by the violation of the affected person's right to publicity. *Vigoreaux Lorenzana vs. Quizno's Sub,* 173 D.P.R., on pg. 267, citing R. Schechter & J. Thomas, *Intellectual Property: The Law of Copyrights, Patents and Trademarks* 263–269 (Thomson & West 2003).

-C-

After this case law was established, the Law on the Right to One's Image, Law No. 139-2011 of July 13, 2011, 31 L.P.R.A. § 3151 *et seq.* This new measure essentially seeks protection against the unauthorized or non-consented use of one's own image for commercial or advertising purposes. Article 1 of the aforementioned statute establishes that "image" shall mean the "name, photograph, portrait, voice, signature, attribute, or any representation of a person that serves to identify that person, before an average observer or listener, by means of any reproduction procedure or technique." 32 L.P.R.A. § 3151(c).

**\*21** Article 2 of the law establishes the following causes of action:

> Any natural or legal person who uses the image of another person for commercial, mercantile, or *advertising* purposes without the prior consent of the latter, of the person who holds a license on said image, of the heirs in case of death or of the authorized agent of one of these, *will be responsible for the damages caused.*

> In the event that the consent required in this Law is not obtained, the affected person may file an action to stop the use of said image and to recover the damages caused, including unearned royalties or *any economic loss resulting from the violation of the right established herein.*

32 L.P.R.A. § 3152. [27]

In summary, if it is shown that the defendant used the image of a person for any lucrative or commercial purpose, the aforementioned legislation grants the injured party, *whether this is a public figure or not,* the remedy of an *injunction,* **a cause of tortious action or the statutory remedy.** [28] In case of prevailing, the sentencing court may set the amount of damages based on the following criteria: "(1) the gross profit that the infringing party had obtained through the use of the image in question; (2) the amount of the profit that the injured person failed to receive as a result of the actions of the

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 17 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

defendant; (3) the value of the impairment that the defendant's actions would have caused the plaintiff; (4) and any other factor that, in the judgment of the court, adequately qualifies the damages." 32 L.P.R.A. § 3153.

The exceptions to the application of the legislative norm are configured in the following instances:

(a) When the image of a person is used on any medium as part of a news report, political expression, the transmission of a sporting or artistic event, *or a presentation that has a legitimate public interest, [provided that]* [29] *it is not used for commercial or advertising purposes.*

(b) When the image of a person is used as part of a satire or parody, *where the main purpose of the use of the image is not commercial or advertising.*

(c) When the image is used for critical or commentary, academic, or research purposes, *provided that such use does not constitute a covert exploitation of the protected image.*

(d) When the image of an accessory person is used.

32 L.P.R.A. § 3157. (Emphasis and underlining are ours).

Now, it is important to note that, as regards the possible exceptions referred to in that article, a simple reading is sufficient to understand that, even if it is indeed determined that the conduct imputed to the defendant parties constitutes a "news report, political expression, the transmission of a sporting or artistic event, or a presentation that has a legitimate public interest, [ ... ]," **this in itself is not enough to exempt them from liability,** because it also requires that the questioned action "not be used for commercial or advertising purposes." Note that the provision emphasizes at all times that these defenses are available to the medium if the purpose of the reproduction of the image is not "commercial or advertising" or a "disguised exploitation."

**\*22** Law No. 139-2011 also establishes a limited immunity to the owners or employees of any mass communications media in which the image of a person appears in violation of the statute. They will not be responsible for the damage caused, except in the case "in which it is established that they were aware that the use of that image was made without the required authorization." 32 L.P.R.A. § 3158.

## -D-

The article published in TV y Novelas was announced on the cover of the magazine with a photo of Messrs. Ayala Otero and Rivera Nieves together with the text: "Scandal! They accuse a Gurabo police officer of being a rapist." Inside the magazine, the same photo was reproduced in larger size. The article, entitled "Eduardo Rivera Nieves accuses a police officer of rape," was given a headline that read "Real Life Soap Opera."

Regarding the part of the photograph that shows the face of Mr. Ayala Otero, it does not appear from the file who took it or under what circumstances. The photograph was provided by Mr. Rivera Nieves without the consent or knowledge of Mr. Ayala Otero. Regarding the claim for violation of the right to one's own image, for placing that photo on the cover of the magazine and in the middle of the report that refers to the plaintiff Ayala Otero, Mr. Venegas Guzmán's deposition is quite illustrative of the goal of that editorial decision. Here is an important fragment:

MS. MORAIMA CARRASQUILLO COLON

Q The fact that... The fact that the other party, in this case the plaintiff, Samuel, was a police officer.

MR. WILLIAM MAURICIO VENEGAS GUZMAN

A Yes.

Q Was that the reason you put it on the cover?

A That was the main reason I published it. Analyzing, even, the photograph.

Q Please elaborate more on what you analyzed in the photograph.

A When I saw several photograph options, I realized that *that photograph carried a clear message* from two people who would corroborate the headline and the story with the single image. And since it was documented, right?, and... uh, **I was going to put the word "police" on the cover, well, *it was going to be a hook that drew attention, and people were going to have interest in reading it.* More if... I used, as I did, the word "scandal," which are words that, for all human beings, right, generate additional interest?**

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 18 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

Q That is, that the fact that… to publish it on the cover, *the reason for publishing the photo on the cover, right, I have to understand that it was to be able to sell more magazines?*

**A It was part of the editorial concept that I managed in order to attract attention, right.** *This is a business, yes, but I take into account several elements there, right, that have to do with the interest of readers, commercial interests, advertising interests, journalistic interests.*

***23 Q Would the answer be yes, it was to bring in more customers?***

MS. LIZETTE C. VELEZ RIVE:

A He already answered it, miss.

[ ... ]

MS. MORAIMA CARRASQUILLO COLON

Q *What I want to know is if it was a... a... one of the goals was to attract more customers.*

MR. WILLIAM MAURICIO VENEGAS GUZMAN

A I am a journalist and my intention is to attract attention with a means of communication, right, since it is a magazine. The company has its interests, it would be necessary to ask the company what its interests are, as such. *Mine is to please people, draw attention, entertain people, cause an interest.*

Q Please open the magazine you have there to page 86. Before that, were you, in fact, the one who decided to publish that photo on the cover and that photo on page 86 of the magazine?

A Yes.

**Q Were you the one who chose the photo?**

**A Yes.**

[ ... ]

Our emphasis. Compliance Brief of Mr. Ayala Otero, pgs. 488–492.

We agree with the Court of First Instance that, regarding the question raised, the dispute over whether Editorial Televisa and its employees Matos Figueroa and Venegas Guzmán had the editorial, commercial, or advertising intention of placing the photo of Mr. Ayala Otero on the cover, to attract "the attention of the clients," which is the same as saying "to 'sell' the magazine," requires the holding of an evidentiary view. As the Ninth Circuit Court of Appeals ruled: "*The first step toward selling a product or service is to attract the consumers' attention.*" *Abdul* (Quotes omitted).

As we have already pointed out, the fact that the publication had a legitimate interest does not release, by that fact alone, the appellant parties from civil liability. We saw that, even if the publication is determined to constitute a "news report, political expression, the transmission of a sporting or artistic event, or a presentation that has a legitimate public interest, [ ... ]," this does not provide grounds for dismissing the lawsuit for violating image rights, since the law requires that the image "not be used for commercial or advertising purposes." Law 139 emphasizes at all times that the defense of public interest is available to the news media if the purpose of the reproduction of the image is not "commercial or advertising" or a "disguised exploitation."

As the Court of First Instance pointed out in its judgment, that purpose is not entirely clear in this case. Mr. Ayala Otero has the right to prove that the exception of public interest claimed by Editorial Televisa and Messrs. Matos Figueroa and Venegas Guzmán does not exist, because their immediate objective in using the photograph on the cover of the magazine and in the text of the article was predominantly commercial or advertising, which could generate compensation, even statutory, if proven by a preponderance of proof.

***24** The confirmation of this part of the appealed partial judgment is admissible.

V

For the grounds expressed, the judgment appealed against is upheld to the fullest extent. The suspension of the proceedings before the Court of First Instance is annulled and the continuation of the proceedings is ordered.

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 19 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

It was agreed and ordered by the Court and certified by the Clerk of the Court of Appeals.

DIMARIE ALICEA LOZADA

Clerk of the Court of Appeals

# Footnotes

1 Through administrative orders TA-2016-113 and TA-2016-128, the Hon. Sigfrido Steidel Figueroa, replacing the Hon. Laura I. Ortiz Flores to attend to the final disposition of both cases.

2 In the recourse KLAN201600735, there appear as appellees: ES Televisión Corp., Telemundo of Puerto Rico Inc., Leo Fernández III, Saudy Rivera, Diosdada Romero, Tomás Ramos, t/c/c Red Shadow, Raad Broadcasting Corp., Editorial Televisa–Puerto Rico, h/n/c Revista TV y Novelas of Puerto Rico, Omar Matos Figueroa, and William Venegas Guzmán.

3 In the resource KLAN201600763, only Samuel Ayala Otero appears as appellee.

4 App. of the case KAN201600735, pgs. 1–5; see, also, the amended lawsuit in the App. of the case KLAN201600735 on pgs. 41–47.

5 Annex to case KLAN201600735, pgs. 735–739.

6 In summary, it reported that Mr. Rivera Nieves expressed in both complaints that he had threatened him with his regulation weapon and physically and sexually assaulted him, that he incited him to perform oral sex in a patrol car during working hours, which, according to Mr. Rivera Nieves, had already happened, among other supposedly false facts. Based on the documents submitted in the annexes to both recourses, we take legal notice that none of the complaints produced administrative or criminal sanctions against Mr. Ayala Otero.

7 Annex to case KLAN201600735, pgs. 673–675.

8 Annex to case KLAN201600735, pgs. 636–662.

9 Annex to case KLAN201600735, pgs. 663–672. See also Annex XIII.

10 See, Annex to case KLAN201600735, pgs. 452–473.

11 Annex to case KLAN201600735, pgs. 6–40; 48–83.

12 See, Annex to case KLAN201600763, pgs. 30–295; Annex to *Deed pursuant to order,* pgs. 46–471; Annex to *Joint Opposition,* pgs. 5–37; 1692–1950; Annex to *Argument in Opposition,* pgs. 1–49; Annex to *Opposition to recourse for appeal,* pgs. 122–163.

13 Annex to case KLAN201600735, pgs. 109–446.

14 Annex to case KLAN201600735, pgs. 447–451.

15 Annex to case KLAN201600763, pgs. 1053–1059.

16 Annex to case KLAN201600763, pgs. 1067–1073.

17 Quoting Santos Briz, *Civil liability* 146 (7th Ed., Editorial Montecorbo 1993).

18 Section 2 of the Libel and Slander Act defines libel as follows: Libel is understood as malicious defamation that is publicly made against a person, in writing, print, a sign, portrait, figure, effigy, or other mechanical means of publication, tending to expose said person to the hatred of the people or their contempt, or to deprive them of the benefit of public trust and social treatment, or to injure or disgrace them, or any published malicious defamation, as aforesaid with the intention of denigrating or depressing the memory of a dead person and discrediting or provoking surviving relatives and friends.

  32 L.P.R.A. § 3142.

19 In determining whether the plaintiff is a public figure, the court must consider the following factors: (1) whether they are particularly prominent in the affairs of society; (2) if they have the capacity to exercise influence and persuade in the discussion of matters of public interest; (3) if they actively participate in the discussion of specific public disputes with the purpose of tipping the balance in the resolution of the issues involved; (4) the importance or public interest of the matter or dispute in question; (5) the nature of the allegedly defamatory statement; (6) to whom the expression is directed; and (7) the functional relationship between these last two

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 20 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

factors. *Garib Bazain vs. Clavell,* 135 D.P.R., 475, 482–483 (1994); *Torres Silva vs. El Mundo, Inc.,* 106 D.P.R. 415, 422 (1977).

20   Definitely, *New York Times Co. vs. Sullivan,* 376 US 254, 279–280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), "mark[ed] a new milestone in strengthening the constitutional guarantee of freedom of the press by determining that the publication of a false report or unwarranted comments relating to the official conduct of a public official are immune from libel claims and enjoy a restricted privilege, unless the information was published knowingly to be false or in serious disregard as to whether it was false or not. It will be necessary [ ... ] for the public official to demonstrate the existence of actual malice as an essential requirement to be compensated for damage to his reputation." José Julián Álvarez González, *Constitutional law of Puerto Rico and constitutional relations with the United States* 997 (Temis 2009).

21   See also *Clavell vs. El Vocero de PR,* 115 D.P.R. 685, 692–693 (1984).

22   For example, in *Oliveras vs. Paniagua Diez,* 115 D.P.R. 257 (1984), Judge Rebollo López expressed in his concurring opinion that expressions, comments, or criticism "are not libelous under the doctrine of the '*fair comment*' or of the logical and reasonable inference that a person can make of a certain fact, which are protected by the right of freedom of expression that are guaranteed to every person by the Constitution of the Commonwealth of Puerto Rico and the Constitution of the United States of America." *Id.,* 115 D.P.R., on pg. 272.

23   This protection of the free exchange of ideas and thoughts is evident in a society like the United States, whose mores and practices in political interaction we have copied. There and here, the constant, meticulous, and bitter accusations and questions to public officials are frequent, habitual, and constitute part of the daily and recurrent political activity. Regarding this specific behavior, the writer Nimmer has expressed the following when referring to the defense of hyperbole, although his words are equally applicable to any defense related to inferences or reports on actions of public officials:

> In determining whether a statement is in fact false, it is sometimes necessary to look beyond the literal meaning of the words in order to determine the message in fact communicated. If it is manifest that if the speaker is engaging in hyperbole, then an appropriate discounting of literal meaning must be made. Thus, "the overenthusiastic use of rhetoric" will not divest the speech of First Amendment protection, even though in a sense the speech involves knowing falsity. Such hyperbole is particularly likely to arise in the realms of religious faith and political belief. The Supreme Court has observed that in both these fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and the right conduct on the part of the citizens of a democracy.

*Nimmer On Freedom of Speech: A Treatise on the Theory of First Amendment,* sec. 3.03[B][4], pgs. 3–24 to 3–25 (1984).)

24   See also *Gertz vs. Robert Welch, Inc.,* 418 US 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and *St. Amant vs. Thompson,* 390 US 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Libel and slander: what constitutes actual malice, within federal constitutional rule requiring public officials and public figures to show actual malice,* 20 A.L.R. [American law Reports] 3d 988; *Who is 'public official' for purposes of defamation action,* 44 A.L.R. 5th 193; *Criticism or disparagement of character, competence, or conduct of candidate for office as defamation,* 37 A.L.R. 4th 1088.

Case 4:21-cv-00335-RGE-SBJ   Document 24-4   Filed 03/28/22   Page 21 of 21

Ayala Otero vs. Rivera Nieves, 2016 WL 5369286 (2016)

26    United States case law recognizes that one of the most important differences between the right to privacy and the protection of image rights, or right to the publicity of the image, is the economic value of its use by a third person. The person requesting the protection of his right of publicity has to prove the existence of the commercial value of his image or the use of his image. That is, the right to publicity protects individuals from the exploitation of their names and likenesses for commercial purposes; it protects a proprietary right, concentrated in the economic value of the name and the likeness. That is why it is said that the violation of the right to publicity becomes an unjust enrichment of those who make inappropriate use of another's image. Thus it was resolved in *Zacchini vs. Scripps–Howard Broad. Co.,* 433 US 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977).

27    The statute defines the following terms:

      h) Commercial purpose—the use of a person's image in connection with an advertisement, offer for sale, or sale of a product, merchandise, good, or service on the market.

      i) Advertising purposes—the use of a person's image when disseminating or informing the public about a good or service on the market through the media, including use in institutional advertisements.

    Art. 1 of Law No. 139-2011(h)(i).

28    Statutory damages may be assessed in an amount of not less than $750 and not more than $20,000 per violation, at the discretion of the court. If the judge determines that the violation was intentional or grossly negligent, the amount of statutory damages may be increased to no more than $100,000 per violation. Each violation under these statutory damages will be equivalent to the act of unlawful use of the claimant's image in a work, regardless of the number of copies made of the work in question at any given time. In addition, contrary to our civil law, which establishes that ignorance of the law does not excuse noncompliance (31 L.P.R.A. § 2), Law No. 139–2011 provides that "[w]here the court determines that the defendant was unaware of and had no reason to know or believe that his actions constituted a violation of the rights of the plaintiff, the court, at its discretion, may reduce the amount of damages."

29    The original text that replaces the bracket is "and where," which does not reflect the true meaning of the judgment. That is why we have replaced it with "whenever."

---

**End of Document**                              © 2021 Thomson Reuters. No claim to original US Government Works.