# EXHIBIT C



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Bonilla Medina v PNP**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Jacqueline Yorke

Sworn to before me this
February 23, 2022

Signature, Notary Public

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

1996 JTS 33,140 D.P.R. 294,1996 WL 539089 (P.R.)

LUIS BONILLA MEDINA and OTHERS,
claimants and appellants,

v.

NUEVO PROGRESISTA PARTY,
defendant and respondent.

In the Supreme Court of Puerto Rico.
*Number:* CE-94-543

**Synopsis**
*CERTIORARI* PETITION to review a JUDGMENT of *Carmen Celinda Ríos,* J. (San Juan), which dismisses a certain claim for damages and losses for the use without authorization of a photograph of the claimant in an advertisement of the Nuevo Progresista Party. *Confirmed* and *the imposition of fees for recklessness is revoked.*

*Juan M. Ponce Fantauzzi.* of *the Law Firm Ponce Fantauzzi,* lawyer of the appellants; *Max Pérez Preston,* lawyer of the respondent.

ASSOCIATE JUDGE MR. HERNÁNDEZ DENTON issued the opinion of the Court.

In case in question, we are responsible for establishing a delicate balance between two (2) rights of the highest constitutional hierarchy: freedom of expression, in a situation in which the challenged expression is a political expression, and the right to privacy, in its aspect of the right to self-image.

Luis Bonilla Medina appears before us and requests the revocation of the judgment issued by the Superior Court, Courtroom of San Juan, which dismissed his claim for damages and losses for the unauthorized use of a photograph of him in an advertisement of the Nuevo Progresista Party (hereinafter, P.N.P. [Partido Nuevo Progresista]). On the understanding that in the case in question the appellant's right to privacy, in its aspect of the right to self-image, must yield to the freedom of political expression of the then candidate for governor Dr. Pedro J. Rosselló González, we confirm the judgment that dismissed the filed claim. **\*297**

**I**

The lawsuit in the case at hand arises from the publication of a photograph of the appellant. Luis Bonilla Medina, in an advertisement by the P.N.P. published in the newspaper *El Nuevo Día* on March 30, 1992, which promoted certain walks that the political party would carry out as part of the campaign made for the 1992 general elections. The photograph shows the appellant on the balcony of his residence, adjacent to the sidewalk, shaking hands with the then candidate for governor of the P.N.P. Dr. Pedro J. Rosselló González. At the top of the photograph, there is the slogan "Rosselló Con la Fuerza del Pueblo" [Rossello with the Strength of the People] and at the bottom there is an itinerary entitled "Schedule of visits to towns" followed by the phrase "...for a new start." Appendix, p. 26.

Luis Bonilla Medina, his wife, María Vázquez Avilés, and the community property of Husband and Wife presented a lawsuit for damages and losses against Dr. Pedro J. Rosselló González, the P.N.P., Mr. Marcos Morell, in his capacity as Secretary of the P.N.P. and others, in which they alleged that the publication of the photograph of Bonilla Medina without his consent constituted a violation of his right to privacy. They alleged that the defendants published the photo "with the veiled purpose" of transmitting "the underlying message that the claimant had joined the Nuevo Progresista Party" (Appendix, page 22) and that because of its publication, they had been subject to insults by people in their community "who thought that they had abandoned their principles." Id. They pointed out that Bonilla Medina is known in the community of Isabela and in the neighboring towns as a member of the Popular Demócratico Party, "since he was one of the founders of that group in the region." Id. **\*298**

The defendants filed a motion for summary judgment, in which they alleged that there was no dispute whatsoever over the material facts of the case and that the claim did not meet the requirements of a cause of action for libel, and consequently it should be dismissed. The claimants filed a brief of opposition. They argued, in summary, that their cause of action was for violation of the constitutional right to privacy, as recognized in *Colón v. Romero Barceló,* 112 DPR 573 (1982), and not a cause of action for libel, so it was not appropriate to issue a summary judgment that dismissed the claim.

The Superior Court issued a summary judgment against Bonilla Medina. It dismissed his claim on the understanding that, unlike in *Colón v. Romero Barceló,* supra, Bonilla Medina waived his right to privacy by shaking hands with Dr. Rosselló. It also concluded that "political advertisements are protected by the right of freedom of expression as guaranteed by our Constitution and the First Amendment of the Constitution of the United States." (Citations omitted.) Appendix, p. 24.

Dissatisfied with that determination, Bonilla Medina and the other claimants appear before us and request the revocation of the judgment issued by the court of first instance. In summary, they allege that the court erred in determining that the appellant waived his right to privacy by having shaken hands with Dr. Rosselló. On the understanding that in the case in question, freedom of expression has a greater hierarchy than the right to privacy of Bonilla Medina, we confirm the judgment of the trial court that dismissed the claim filed.

## II

[1] Sec. 4 of Art. II of the Constitution of the Commonwealth of Puerto Rico, L.P.R.A., Volume 1, ed. 1982, p. 265, recognizes freedom of expression as one of the *299 values of the highest hierarchy within our constitutional order:

> No law shall be passed that restricts the freedom of speech or the right of the people to meet in a peaceful assembly and to ask the government to make good grievances.

[2] The Report of the Commission on the Charter of Rights of the Constituent Convention acknowledged that these rights "cover the general scope of freedom of conscience, thought, expression, and their own activities to fully exercise all these rights within the most extensive freedom." 4 Journal of Sessions of Constituent Convention 2564 (1951).

[3] Freedom of expression is an "indisputable root of the government's democratic system." *Mari Bras* v. *Casañas,* 96 DPR 15, 20-21 (1968). See also *Coss and U.P.R.* v. *C.E.E.,* 137 DPR 877 (1995). To this end, we have cited with approval the expressions of the Federal Supreme Court in *Mills v. Alabama,* 384 U.S. 214 (1966), relating to the First Amendment of the Federal Constitution, which guarantees freedom of expression:

> "Regardless of the various interpretations on the First Amendment, the opinion is practically unanimous to the effect that its main purpose is to protect free discussion on government matters. Of course, this includes the discussion about candidacies, structures and forms of government, the way government management is conducted or should be conducted, and everything related to political processes. *"D"* Mari Bras v. *Casañas,* supra, p. 22.

Political expression must receive the highest degree of constitutional protection in our pluralist society. In this community, decisions are made democratically, so that the will of the majority emerges while respecting the rights of minorities. This implies the free exchange of ideas, opinions and information on government and political processes. *300

On multiple occasions, the highest federal forum has emphasized the preeminence of political expression within the constitutional hierarchy of protection of freedom of expression:

> ...the First Amendment was "designed with the purpose of ensuring the free exchange of ideas to promote the political and social changes desired by the people," *Roth* v. *United States,* 354 U.S. 476 (1957)°, *so it cannot be doubted that this constitutional guarantee has its most complete and important application in the management of campaigns of candidates for political positions.* (Our translation and emphasis.) *Monitor Patriot Co.* v. *Roy,* 401 U.S. 265, 271-272 (1971). See, in addition, *Buckley v. Valeo.* 424 U.S. 1, 14-15 (1976).

[4] Nevertheless, we have previously stated that the higher value granted to freedom of expression in our constitutional order "does not entail absolute lack of restriction, so that it cannot be subordinated to other interests when public necessity and convenience so require." *Mari Bras* v. *Casañas,* supra, page 21.

The case in question presents an example of the possibilities of conflict between the right to free expression and the right to privacy. See *E.L.A. v. Brotherhood of Employees,* 104 DPR 436 (1975). The claim of Bonilla Medina is based on the cause of action in damages and losses, under Art. 1802 of the Civil Code, 31 L.P.R.A. sec. 5141, recognized in *Colón* v. *Romero Barceló,* supra, for violation of the right to privacy in its aspect of the right to self-image.

On that occasion we revoked the judgment of the lower court that dismissed the lawsuit of the widow and the children of Mr. Tulio Rivera Lugo against former governor Carlos Romero Barceló and the "Carlos 80 Committee" for the publication of a grotesque photograph of the body of their husband and father, who was murdered on September 24, 1977, in a television advertisement three (3) years after his death.

[5] We recognize the right to the self-image in our *301 jurisdiction based on "the character and primacy of the right and protection of privacy" guaranteed by our Constitution in Sections 1 and 8 of its Article II, L.P.R.A., Volume 1. As we explained in *Colón* v. *Romero Barceló,* supra, citing Santos Briz, "by virtue of this right (to self-image), any person is able to oppose the reproduction of their image or the photographic versions of the same, by persons to whom they have not granted express or tacit authorization." Colon v. Romero Barceló, supra, p. 578, citing J. Santos Briz, *El Derecho de Daños [Damages Law],* Madrid, Ed. Rev. Der. Privado [Private Law], 1963, pp. 178-179.

We note, however, that "it is considered admissible, without prejudice to other grounds for justification, to publish or take photographs in the sphere called contemporary history *(aus dem Bereich der Zeitgeschichte)* not relating to private life, or when they relate to meetings, demonstrations or other similar public acts or events or public localities in which the photographed person is an accessory figure." Colon v. Romero Barceló, supra, p. 578, citing Santos Briz, *op. cit.* In these cases, civil doctrine recognizes that the right to one's self-image must yield to the public interest of access to information.

Having examined the relevant regulations, our task is to establish a balance between the interests of the free expression of Dr. Pedro J. Rosselló González, who was a candidate for governor of Puerto Rico at the time of the events of the case in question, and the interests of Bonilla Medina on his privacy and image.

### III

Bonilla Medina alleges that he suffered a violation of the right to privacy, in his aspect of the right to self-image, by the publication of his photograph without his *302 consent. In his petition against the issuance of a summary judgment, he expressly rejected that his cause of action was for libel or defamation.

It appears from the file that the photograph disseminated by the P.N.P. was taken as part of a walk against drugs when Dr. Pedro Rosselló was a candidate for the highest office in our country. This was taken while Rosselló González was on a public sidewalk in front of the balcony of the residence of Bonilla Medina, in a place visible to the general public. In light of these circumstances, the right to privacy of Bonilla Medina, in relation to his right to his own image, must yield before the freedom of expression of the then future candidate for governor.

There is no doubt that the photograph was used as part of a political campaign in an election process. In the advertisement in which it appeared, citizens were informed of the schedule of visits of the P.N.P. walking tour in certain towns of the Island.

In the case at hand, unlike in *Colón* v. *Romero Barceló,* supra, we are dealing with a photograph taken in an event of public interest and in a place in view of the general public where Bonilla Medina was an accessory figure. As we noted in *Colón,* supra, the civil doctrine of the right to self-image allows the publication of photographs taken in public places or events without the authorization of the person photographed when he or she is an accessory figure. The photo shows the then candidate for the government, Rosselló González, greeting Bonilla Medina during a walk while other people watch. This is not the photo of a person who enjoys widespread recognition in Puerto Rico. So it could have been any other member of the community shaking hands with Rosselló González. In *Colón,* supra, the situation was not one of accessory nature. The contested publication *303 was a grotesque photo of the body of a murdered person. It was a situation that attempted to "capitalize" at the expense of the pain of others.

Bonilla Medina expressly rejected that his cause of action was for libel or defamation. However, one of the allegations of the lawsuit is that the photograph was published with the "veiled purpose" of giving the impression that the claimant supported the candidacy of Dr. Pedro J. Rosselló González to the governorship of Puerto Rico, which was false and harmful to his reputation. We cannot support the argument that the mere slogan of the "Rosselló With the Strength of the People" campaign, together with the contested photo, in an advertisement that reported the itinerary of a whole series of walks, leads to that conclusion.

Usually, in a campaign for any elective position, both the press and the candidates themselves take photographs of all political events and it is not until the activity ends that the ones that will be used in the campaign are chosen. At the time of taking the photograph, it is generally unknown whether it will be selected for publication.

If we recognize a cause of action in a case such as the one in question, we would be imposing on political contenders the excessively onerous obligation to obtain consent from each person whose photo is published as part of their political campaign. This would have the effect of limiting or "freezing" the expression, a situation that Section 4 of Article II of our Constitution, *supra,* and the First Amendment of the Federal Constitution, *supra,* precisely intend to avoid.

We do not rule here that any expression made during the political process is absolutely protected. We only conclude that the specific facts before us justify that the freedom of expression of the then **\*304** candidate for the governorship of Puerto Rico prevails over the slight intrusion in privacy that Bonilla Medina may have suffered.

### IV

The appellants also point out that the lower court should not have issued a summary judgment, since in their opinion there was a dispute over essential facts in relation to the cause for action exercised. They are incorrect.

[6] Rule 36.2 of Civil Procedure. 32 L.P.R.A. Ap. III. allows a defendant to request at any time that a summary judgment be handed down in its favor on part or all of the claim against it. This is applicable if

> ... the allegations, ...depositions, responses to interrogations and admissions offered, together with the sworn statements, if any, demonstrate that there is no substantial real dispute regarding any material fact and as a matter of law, a summary judgment must be issued in favor of the petitioner. 32 L.P.R.A. Ap. III.

[7-8] In the event that there is a dispute in relation to the facts, it is not appropriate to issue the summary judgment and any doubt must be resolved against the petitioning party. *Cuadrado Lugo v. Santiago Rodríguez,* 126 D.P.R. 272 (1990). In *Méndez Arocho* v. *El Vocero de PR.,* 130 DPR 867, 874 (1992), we express:

> This procedural mechanism is especially desirable in those cases in which freedom of expression is involved, since the extension of these lawsuits may have a paralyzing or deterrent effect *(chilling effect)* on the exercise of this fundamental right. See: *Villanueva v. Hernández Class,* 128 DPR 618 (1991); *Oliveras* v. *Paniagua Diez,* 115 DPR 257 (1982); *García Cruz v. El Mundo, Inc.,* 108 DPR 174, 182 (1978). **\*305**

It was not in dispute that the published photo was taken at a public event, in a place that was visible to the general public; that Bonilla Medina was an accessory figure, and that the photo was used as part of a political campaign. By applying the regulations existing prior to the case in question, we resolve that the court of first instance acted correctly when determining that the facts in dispute did not exist and by dismissing the claim through a summary judgment.

### V

Lastly, the appellants challenge the decision of the trial court to impose fees for recklessness. They point out that "any judicial claim against private persons for violating their right to their personal integrity and image are rights recognized in the Constitution, jurisprudence and by legal scholars," which is why they should not have been ordered to pay fees for recklessness. Petition for *certiorari,* p. 16. They are right.

[9-10] Rule 44.1(d) of Civil Procedure provides that "if any party has proceeded with recklessness, the court shall impose on it in its judgment the payment of a sum for attorney fees." 31 L.P.R.A. Ap. IV. The objective of the imposition of attorneys' fees is to penalize the litigant that "due to its stubbornness, obstinacy, contempt and insistence on an attitude devoid of grounds, forced the other party, unnecessarily, to assume the disturbance, expenses, work and inconvenience of a lawsuit." *Fernández* v. *San Juan Cement Co., Inc.,* 118 D.P.R. 713, 718 (1987). See *Soto* v. *Lugo,* 76 DPR 444 (1954). This determination rests on the sound discretion of the sentencing court. *Raoca Plumbing* v. *Trans World,* 114 DPR 464 (1983). The fees thus granted shall not be changed by an appellate court unless they are excessive, insufficient or **\*306** constitute an abuse of discretion. *Ramirez v. Club Cala de Palmas,* 123 DPR 339 (1989).

When examining the cause of action exercised in the case at hand in light of the foregoing considerations, we conclude that Bonilla Medina was not reckless when filing the claim; since in *Colón* v. *Romero Barceló.* supra, a cause of action for violation of the right to one's self-image based on the right to privacy had been recognized.

On the basis of the foregoing grounds, *the order is issued and the decision of the lower court that dismissed the claim for damages* and *losses presented in the case described is confirmed. The imposition of fees for recklessness is revoked.*

Associate Justice Mr. Negrón García issued a dissenting opinion. Associate Justice Mr. Fuster Berlingeri dissented without a written opinion. Associate Justice Mr. Corrada Del Río did not intervene.

--O--

Dissenting opinion of Associate Justice Mr. Negrón García.

A citizen photographed in a public activity that, from the open balcony of his home, responds courteously to the handshake greeting of a political candidate: does he waive his right to privacy? Does this entail an authorization for that photo, which highlights his image, to be published as an *advertisement* in the promotional campaign of the election campaign of that candidate, which infers his support?

In order to respond correctly and legally to these questions a careful examination of the photograph and the advertisement in question is required. Let us remember that "...what we see with our own eyes happens before we use a microscope; and if it is true that healthy eyes do not see as many things as the microscope..., what the eyes can see is more true, and without them the microscope is nothing." **\*307** L. Castellani, *Comentarios a la Suma Teológica [Comments to the Theological Sum]*, cited by P.J. Bertolino, *La Verdad Juridica Objectiva [The Objective Legal Truth]*, Buenos Aires, Ed. Depalma, 1990, p. 101.

**I**

On November 19, 1991, a walk was carried out in the town of Isabela to promote the rejection of drug use. Civic, religious and political leaders of *several* parties participated in the activity; among them Dr. Pedro Rosselló, a candidate for governor from the Nuevo Progresista Party (hereinafter, the PNP), and Mr. Carmelo Rivera, Mayor of Isabela, also of the PNP. The civic activity was called: "Isabela says No to Drugs, March for a Puerto Rico without Drugs and an Isabela without Coke."

Mr. Luis Bonilla Medina was in the company of his mother, Mrs. Miguelina Medina, and a young woman on the open balcony of his home that borders and projects onto the sidewalk. When the walk passed in front of his balcony, Dr. Rosselló extended his hand *from the sidewalk* as a greeting, a gesture that Mr. Bonilla Medina courteously responded to *from his balcony,* offering him his hand. Without Mr. Bonilla Medina realizing it, this moment was captured by a photographic lens *from outside* the residence.[1] **\*308**

Four (4) months later, on March 30, 1992, said photo was published in the newspapers *El Vocero de Puerto Rico* and *El Nuevo Día* as part of a *political-party advertisement, sponsored by the P.N.P.*
The photo that was *published* is the same one described above, reduced and cropped on the right side. (See Appendix B). The advertisement shows the campaign slogan in clear, large letters on top: *'Rosselló with the Strength of the People.*" A schedule of visits to towns by Dr. Rosselló appears below it, as a candidate for Governor of the P.N.P. with the official symbol of this political party. It contains the following slogan in large and clear letters: ."*.. For a new start."* On the lower left margin it says *"Paid Political Advertisement."*

On May 26, 1992, Mr. Bonilla Medina, his wife, Ms. María Vázquez Avilés, and the community property of Husband and Wife filed in the Superior Court, San Juan Chamber, a lawsuit for damages and losses against the P.N.P. Dr. Rosselló and others. In summary, they alleged that Mr. Bonilla Medina did not notice that he had been photographed when he greeted Doctor Rosselló; that in violation of his right to privacy, the photo was published behind his back, without his prior authorization or consent: that Mr. Bonilla Medina is a well-known founding member of the Popular Demócratico Party (hereinafter the P.P.D.) in the community of Isabela and neighboring towns; that the advertisements convey the false impression that he had joined the P.N.P. and that after the publication, he has suffered abuse, insults and contempt from people in his community who understood that he had betrayed his political principles.

On July 22, the co-defendants requested the summary dismissal of the claim. Following several procedures, **\*309** on June 29, 1994, the honorable lower court (Hon. Carmen Celinda Ríos, Judge), agreed and issued a dismissal judgment.

This venue concluded that Dr. Rosselló and his party's committee "moved to the balcony of his residence, with Mr. Bonilla Medina [0] renouncing all legitimate expectation of privacy in relation to what happened specifically in front and on the balcony of his home." Appendix, p. 23. It is then stated that "in consenting to the entry without any safeguard or limitation, the claimant *converted* the front and balcony of his house into a public forum." (Emphasis added.) Id. It characterized the lawsuit as without merit and imposed two thousand dollars ($2,000) in attorney's fees for recklessness, plus the costs.

At the request of Mr. Bonilla Medina *et al.,* we now review.[2]

## II

The background of the facts that gives rise to this appeal presents a complex collision between the *right to privacy* **\*310** —*self-image and identity*— and the *freedom* of expression in its facet of candidates in the arena of political partisanship. These rights oblige us to strike a balance based on their recognized hierarchical ranks and reciprocal limitations. In a tight analogical summary, the *right to privacy is equivalent to the heart* of each human being; *free expression,* the blood that nourishes it and, in turn, *gives life to democracy.*

It is well known that both rights — privacy and expression — present different content and, therefore, different limits and effects when projected and inserted into social reality. The *right to personal privacy* is part of the catalogue that modern legal doctrine calls *personality rights.* It corresponds to the spiritual sphere of the person in conjunction with his or her name, morals of author's recognition, honor, self-image, identity (political, professional, occupational), psychophysical integrity, voice, etc. R. De Ángel Yagüez, *La protección de la personalidad en el Derecho Privado [Personality Protection in Private Law],* 83 Rev. Der. Notarial 1, 42 (1974); C. Roger Vidal, *Bienes de la personalidad, derechos fundamentales y libertades públicas [Personal Property, Fundamental Rights and Public Freedoms]*, Bologna, Pub. Real Col. de España, 1985, p. 30 et seq.; J. Beltrán De Heredia y Castaño, *Construcción jurídica de los derechos de la personalidad [Legal Construction of Personality Rights]*, Discurso Real Academia de Jur. y Leg., Madrid, 1976, p. 29.

Privacy is "one of the rights of personality, of an innate and private nature, inherent to man." *Arroyo* v. *Rattan Specialties, Inc.,* 117 DPR 35, 59 (1986). See *P.R. Tel. Co.* v. *Martínez,* 114 D.P.R. 328, 338 (1983). It operates *ex propio vigore* [from its own force] and its infringement can be asserted and generate compensation, even among private persons.[3] *Colón* v. *Romero Barceló,* 112 DPR 573, 576 (1982); *Figueroa Ferrer* v. *E.L.A.,* 107 D.P.R. 250 (1978); *E.L.A.* v. *Brotherhood* **\*311** *of Employees,* 104 DPR 436 (1975); *Alberio Quiñones* v. *E.L.A.,* 90 DPR 812 (1964); *González* v. *Ramírez Cuerda,* 88 DPR 125 (1963).

In *Colón* v. *Romero Barceló,* supra, in endorsing an action for damages and *injunction* for the injury that has been caused by the publication of a grotesque photo of a body, for advertising purposes, regarding the constitutional *referendum* on the right to bail, without the consent of the heirs of the deceased, we quote *in full*:

> There is no, *prima facie* evidence of appearance of the essential rights of the person in the Spanish Civil Code. But, in reality, life, freedom, name, honor and other personal assets, even without having a clear concept of subjective rights, have, however, in our Law, apart from the corresponding protection of the criminal order, *civil protection resulting from the compensation action that with a general nature is established by Art. 1,902 of the Civil Code, against that which, by action or omission, causes damage to another involving fault or negligence.* (Emphasis added.) Castán, *Derecho Civil Español, Común y Foral [Spanish, Common and Regional Civil Law],* 1971, T. I, Vol. 2, p. 341.

Santos Briz explains the right with reference to self-image:

> By virtue of this right, *every person may oppose* the reproduction of their image or the obtaining of photographic evidence of the same, *by persons to whom they have not granted express or tacit authorization.* The prohibition extends to reproducing the image of another in the theater, film or television; and includes not only the publication of the image but also the preparation, drawing or painting of the same without authorization when it opposes the legitimate interests of the affected party, *especially* if according to the object of the photograph *or the method* and *form of obtaining it is scandalous or it occurred against the known will of the person. The authorization to make a photograph does not include the authorization to publish a photograph, as the authorization affects the interested party's personality more intensely than simply making the photograph.* The authorization for publishing may include some limitation whose amplitude will be determined according to the interpretation of the specific case.

Certain doctrine and even foreign legislation considers admissible, without prejudice to other grounds for justification, *the publication or taking of photographs in the sphere called contemporary history* ("aus dem Bereich der Zeitgeschichte") not referring to private life, or *when photographing meetings, demonstrations *312 or other similar public acts or public events or localities in which the photographed person is an accessory figure*. In addition, the publication of photographs made without the permission of the interested party is admitted when so justified by a serious artistic interest. But even in these cases, it should not be tolerated to take a photograph or publish it when a legitimate interest of the photographed party opposes this. *The publication of a photograph should also be considered inadmissible when the taking of the photograph has violated interests worthy of a predominant protection, even if the publication itself does not oppose said interests.*

There are no legal rules in our Law, as unanimously recognized by the authors, that directly protect the personal sphere consisting of prohibiting the reproduction of the self-image. There is no other means for this protection than to resort to the Criminal Code when the reproduction of the image constitutes a crime of insults or slander, or *to consider, in the case of a civil violation derived from non-contractual negligence, that its protection is established in the very broad precept of Article 1,902 of the Civil Code. Thus, until now the assessment of the specific cases has been left at the prudent discretion of the Courts that will rely mainly on the circumstances that concur, both to incriminate the events as a crime or offense, and to rule on the corresponding civil sanction.* Santos Briz, *Derecho de Daños [Damages Law],* Madrid, 1963, pp. 178-179. (Emphasis added and in the original.) *Colon v. Romero Barceló,* supra, pp. 578- 579.

However, the constitutional protection of privacy is not absolute. It will yield to fundamental values, in special circumstances and pressing interests, and in the absence of other alternative means to achieve such objectives.[4] One of these constitutional values, of tremendous importance, is the *right to free expression* of ideas, opinions, beliefs and other personal judgments.

We start from the premise that in our democracy ...the legitimacy of the Government depends on the consent of citizens, that is, "the will of the people is the source of *313 public power..." ...We give this consent through impartial and fair elections... therefore, in order for democracy to triumph and reach its highest potential, it is necessary that citizens consider and deliberate all their options in a spirit of freedom of conscience. ...Our Constitution contains several provisions aimed at ensuring that the process of democratic deliberation remains free, and not discriminatory. *One of the main functions of freedom of expression is to strengthen the debate of political ideas among citizens, since there can be no democratic consent when opposing, dissident* and *heterodox* opinions cannot be expressed. Likewise, when establishing the right to vote, Sec. 2 of Art. II. Const. E.L.A., *supra,* intertwines it with its ulterior purpose of guaranteeing the free expression of the will of the citizen. Finally, freedom of association combines these two (2) rights by preserving a space in which citizens can gather in organizations in order to unite their voices and express their political preferences. (Emphasis on the original deleted and emphasis added.)

*P.P.D. v. Gobernador I,* 139 DPR 643, 713724 (1995), concurrent opinion.

Consequently, the legitimate right of a political candidate to carry out an election campaign and to communicate to citizens his or her points of view, ideas, messages is not debated and, of course, to announce his or her campaign itinerary. However, we are also not faced with an absolute and unrestricted right and it "can be subordinated to other interests when public necessity and convenience so require." *Mari Bras* v. *Casañas,* 96 DPR 15, 21 (1968).

In the dynamics of Puerto Rican partisan politics, we cannot impose restrictions that unnecessarily hinder the right to free expression of political candidates. We take legal knowledge that during walks, car caravans, rallies, meetings and other ways of carrying out this type of campaign, it is normal and natural that there are photographers and private camera operators or those of the country's press constantly and instantly covering them. In public and semi-public events, the right to free expression means that candidates and the press do not have to ask for permission or prior authorization from those participating or who spectate, who, of course, are exposed *314 to be photographed or filmed by means of video or camera. The expectation of privacy of those who are in public or semi-public places, which are susceptible to being captured by the lenses of a photographic camera or video, is minimal; they cannot oppose that photograph or filming.

In [Cox v. Hatch, 761 P.2d 556 (Utah 1988),](url) the Utah Supreme Court had before it a case of defamation, invasion of privacy and abuse of personal identity, by reason of one (1) photo out of five (5) published in a brochure of eight (8) pages that contained several labor articles of Senator Hatch, as part of his reelection campaign. That venue concluded that its use was authorized and incidental, and that freedom of expression prevailed over the generic claim of the right to privacy.

The factual reality found there is *different that of the case in question.* The photo was taken in a semi-public place - the Post Office offices, the workplace of the three (3) claimants - was a campaign action, part of the Senator's reelection campaign; *the claimants were conscious and voluntarily agreed and posed to have the photo taken in question together with the political candidate.*

More importantly, unlike the case before us, that court did not detect "specific allegation that the defendants acted negligently or, in any case, maliciously." (Our translation.) Cox v. Hatch, supra, p. 560. There was no allegation that with the use of the photographs "*any benefit of any value associated with the names or images of the claimants was obtained.*" (Our translation.) Id. p. 565. There was also no allegation of any kind of *claim inherent to the person.*

However, said venue made some pronouncements that are *broadly* compatible with our civil **315** doctrine. *Without strictly adhering to its text,* we share them as a *general rule.*

*First,*

Although is it sufficient to say that consent is an absolute defense, the law must recognize the obvious needs of modern political campaigns and not impose unreal conditions on candidates for public positions as well as incumbents, who are frequently photographed with other people in public places. Requiring the press in general, or politicians or candidates for public positions, to obtain the consent of all persons who are photographed in public or semi-public places prior to the publication of such photographs, would have the effect of "freezing" the publication of much information that is protected by the Constitution. Such an obstacle to the coverage of public events by the news media is not compatible with the First Amendment. If consent plays any role in this context, it would be, without a doubt, limited. (Our translation.) Cox v. Hatch, supra, p. 561 esc. 4.

*Second,* it is not defamatory to point out that someone — in our political reality— is a member of the P.N.P., P.P.D., P.I.P. and other political groupings. Ordinarily,

is it also not defamatory to attribute to a person that he or she supports the candidate of one of these parties. ...It is true, of course, that some people do not recognize any merit in any party other than theirs and feel outraged if they are identified as members of another party. But such subjective perceptions and sensitivities have nothing to do with reputation, since that is based on the collective judgment of a considerable segment of the citizenry. (Our translation and omitted scholions.) *Cox v. Hatch,* supra, p. 562.

*Third,*

Although a person may have a legitimate interest in protecting his or her personality from the exploitation of others, this interest is minimal when the person allows themselves to be photographed in a public or semi-public place, and *especially when that person permits a photograph to be taken of themselves with a politician during their campaign.* The **316** reasonable expectation of all those involved in such circumstances is that such photographs will probably be used in the political campaign. There is no doubt that the publication of a photograph *taken in those circumstances* does not violate a valid and substantial concern for the protection of that person's image or his or her sense of privacy.

Contrary to this interest of a lower hierarchy, there is the prevailing importance for society in general to sustain the free flow of public information. Modern technology exposes everyone who is in a public place to the possibility of being photographed. Events and people of public interest attract television and written press cameras like a magnet. Given the fact that the disclosure and recording of news of interest is such a high priority issue, it is expected that people who are in public or semi-public places and who unexpectedly fall within the lens of the media, do not have an interest of privacy that may prevail over the information interests of information of the First Amendment.

The same applies with greater strength to those who voluntarily allow them to be photographed. *Cf. Hustler Magazine* v. *Falwell,* 485 U.S. 46 (1988). If the law provided otherwise, coverage of news events by electronic means, or of another nature, would be significantly restricted. In summary, we resolve that the photographs of public officials and candidates for public office that are taken in public or semi-public places, with people who pose with them or who, inadvertently, appear in said photographs cannot be the basis for an action for invasion of privacy or abuse of personality. (Our translation and emphasis.) *Cox* v. *Hatch,* supra, p. 563.

### III

According to these precedents, it is obvious that Mr. Bonilla Medina *waived* his expectation of privacy and *could not object to the taking the photograph.* However, it is evident that, maliciously and intentionally, his image was later used by the P.N.P. in another context; that is, a political advertisement to communicate and promote the idea that Mr. Bonilla Medina endorsed the candidate, Dr. Rosselló. That is the only reasonable conclusion that **\*317** is appropriate.[5] Otherwise, what was it published for? It certainly had the purpose of communicating and leading the electorate to that particular partisan conclusion, without its authorization. The P.N.P. had other alternatives: Why was the itinerary not printed only with the candidate's portrait? Why use the image of Mr. Bonilla Medina if, as is claimed, they did not even know his political affiliation? *We should not be* naive. The general rule proposed that a person who publicly, at political events, is exposed to be photographed, and cannot object to the *incidental* publication of their image, *does not apply to the case at hand.* We are faced with a *very peculiar* factual situation that, as an exception, protects *reservations for the indiscriminate use of that image.*

The arguments of the defendants P.N.P. *et al.* are not persuasive, that the placement of the image of Mr. Bonilla Medina "in the political advertisement was incidental to the purpose of the Nuevo Progresista Party, which was to promote the image of his candidate for government, Dr. Pedro J. Rosselló González."

The three (3) photographs in the records themselves, which were presented by the P.N.P., reveal the options that it could well have used without injuring the image and political identity of Mr. Bonilla Medina. In fact, the third photo shows Dr. Rosselló, in another scene, greeting a lady who was sitting on an open balcony of another residence accompanied by some children. See Appendix C. Dr. Rosselló appears followed by his entire numerous entourage. It is evident that the idea suggested in the phrase "Rosselló With the Strength of the People" with the prominent image of Mr. Bonilla Medina (in the background his mother and alongside a young woman), with Dr. Rosselló greeting him, from a numerical point of view, does not make much sense, since a single person along with **\*318** two (2) family members cannot be considered "the people." In fact, in order for the advertisement published to correspond to the message "Rosselló With the Strength of the People" it was necessary to attribute a *special meaning and greater electoral capacity* to the image of Mr. Bonilla Medina. The publication is then explained, if it is known that Mr. Bonilla Medina was a member and founder of the P.P.D. in Isabela, and it can be inferred that the advertisement was prepared to convey the misleading message that he supported the P.N.P.

It is undeniable that, at least in the town of Isabela, the public endorsement of Mr. Bonilla Medina, a known founding member of the P.P.D. — the main party of opposition— of the candidate for the governorship of the P.N.P. had a great propagandistic value; this at the expense of *an intrinsic* value that belonged individually to his person and that could not be exploited in that way, through the publication of his image *without his authorization.*

The publication of that advertisement in the P.N.P. advertising campaign was a direct attack on the right to his own political *identity.* This is the

> *legal interest that a person has not to see the his or her intellectual, political, social, religious, ideological, professional and further assets distorted or altered.* While the image refers to the mere physical reproduction of the person, the *identity represents a complex formula that serves to distinguish the subject in his or her own individuality, compared to the other components of society.* R. Vázquez Ferreyra, Civil *Responsabilidad civil por lesión a los derechos de la personalidad, [Liability for Injury to Personal Rights],* XLV (No. 3) Rev. Jur. Derecho 40- 41 (1995).

The majority, in an accurate manner, argues that "it is considered admissible, without prejudice to other grounds for justification, for the publication or taking of photographs in the sphere called contemporary history *(aus dem Bereich der Zeitgeschichte)* not referring to private life, or when they photograph meetings, demonstrations or other similar public acts or public events or localities in which the **\*319** person being photographed is an accessory figure." Opinion of the Court, p. 301. However, we have explained here why these points are not applicable to the case at hand.

**IV**

This conclusion is not altered by the majority assertion that, "normally in a campaign for any elective position, both the press and the candidate themselves take photographs of all political events and it is *not until the end of the activity that the ones that will be used in the campaign are selected.* (Emphasis added.) Opinion of the Court, p. 303. We ask, the *time* of that selection: is it a criterion that legitimizes the granting of a judicial license that harms the right to the self-image and political identity of citizens?

According to the *preceding* doctrinal basis and *in accordance with the factual peculiarities present,* the right to privacy of Mr. Bonilla Medina must prevail. Although he, publicly, in voluntarily shaking hands with Dr. Rosselló renounced his right to privacy and, therefore, could not require prior authorization to be photographed, that waiver did not lead to the advertising use *in another context* of his own image, and the public distortion of his known political identity; especially when Mr. Bonilla Medina did not know the *particular* use that was prominently given to the photograph. *In this sense, said advertisement attributes to the greeting a scope different from the natural one. Analyzed in its entirety, seen with the phrases referred to, it communicates to the reader a false partisan endorsement* and *an evidently erroneous message.*

It is pertinent to remember the origin of the meaning of a handshake: "In the Middle Ages, when two men met on the road, they gave their right hand to show that they did not intend to take out their **\*320** swords. This handshake symbolized friendship. It has lived on, as a gesture of courtesy, and there are many occasions when it is necessary. Everyone shares the hand of an honored guest." (Our translation.) *World Book Encyclopedia.* pg. 29. In addition, "the handshake is as much of an individual personality as it is our way of walking, and even if we change and improve our way of shaking hands with another, if someone makes us aware of it, our handshake will reflect who we normally are, whether it is shy or confident, warm or distant." Id., p. 241.

In our Puerto Rican environment, shaking the hand of another person in response to their greeting is part of our good manners: it is a polite and friendly gesture. We cannot turn it into a determining *negative* factor to infer an express and unlimited waiver of the *right to the self-image and political identity.* It would be equivalent to promoting civic discourteousness with political candidates or other public figures, who normally extend their hand as a sign of fraternal greeting. *This Court, within the scope of a partisan struggle, should not sponsor a rule of such poor social value that lacks civility.*

To summarize, the photograph was published without the express or tacit consent or approval of Mr. Bonilla Medina in *a different context,* that of a *political-partisan advertisement* (paid political advertisement ). In accordance with the foregoing, it cannot be argued that the mere handshake constituted his consent to that *type of publication.*

The partisan political character of the published advertisement is evident: it said it was a *"Paid Political Advertisement."* Due to the prominence and size of the image of Mr. Bonilla Medina, it is naive to think that its use was merely accidental or accessory. After a comprehensive evaluation, it is logical to conclude that the reaction of an average reader would be to infer that Mr. Bonilla Medina supported or was a sympathizer of Dr. Rosselló. With this advertisement, the P.N.P. obtained the **\*321** the additional advertising benefit of the value associated with the image of Mr. Bonilla Medina; it used the intrinsic value of his known partisan affiliation (P.P.D.) in the town of Isabela.

There were other means for the P.N.P. and Dr. Rosselló to be able to exercise their right to freedom of expression and to report on their activities and campaign itinerary without invading and hurting the privacy of Mr. Bonilla Medina. It was certainly not indispensable to publish the itinerary of the political walks with the photo of Dr. Rosselló *along with other people.* That objective could be achieved even with the publication of the message without any photograph. His inclusion was intended to achieve a *more effective* advertisement, from the publicity point of view of the P.N.P. and its candidate. Nothing prevented them from obtaining the express authorization of Mr. Bonilla Medina. Nothing prevented them from taking a photo for these purposes through the P.N.P. advertising agency, with the prior consent of all participants.

After all, "*greater judicial rigor* is justified when evaluating published advertisements that are messages prepared in the calm and professional atmosphere of experts in the management of public opinion, such as publicists, persons skilled in marketing, communication, etc." *P.P.D.* v. *Gobernador I,* supra, p. 741, concurrent opinion.

We would revoke and impose liability on the P.N.P. We would send the original proceedings to the lower court to establish the damages. **\*322**

APPENDIX A





**\*324**

**\*323**

APPENDIX C



APPENDIX B

## Footnotes

1    We include the photo as Appendix (A). Mr. Bonilla Medina appears in the foreground in the area near the entrance to the open porch of his residence. He has an extended right hand and a serious expression. He wears a light shirt with short sleeves. In front, on the right side, is Dr. Rosselló offering his right hand, while his left hand and forearm are on the right hand and arm of Mr. Bonilla Medina. Mr. Rosselló has firm eye contact with Mr. Bonilla Medina, is half smiling and seems to listen to something. He is wearing a casual, striped, short-sleeved shirt and wears a watch and a wedding ring on his left hand.
We also see two (2) figures of women looking out from a door. The first is an older woman, Bonilla Medina's mother, with a scarf on her head and a light casual robe; she observes the greeting without any particular expression. The other one, is a young woman with dark hair, who looks at the greeting in a curious way. She wears a light-colored suit. On the right side, behind Dr. Rosselló we see a man, who is described as Mayor Rivera of Isabela. He wears dark pants and a striped sports polo shirt; he looks alert looking at the greeting. Behind him we see, partially hidden, a person.

2    As indications they argue:
"FIRST ERROR: The Honorable Appellate Court erred by considering as true ''that the claimant waived his expectation of privacy by allowing Dr. Pedro Rosselló and his partisan entourage who accompanied him to enter up to the balcony of his home."
"SECOND ERROR: The Honorable Appellate Court erred in considering as true that the activity in which the photograph object of this litigation was taken was a campaign activity.
"THIRD ERROR: The Honorable Appellate Court erred in determining that there were no disputes of essential facts and proceeded to issue a summary judgment in favor of the defendants.
"FOURTH ERROR: The Honorable Appellate Court erred in determining that by allowing entry without any safeguard or limitation, the claimant converted the front and balcony of his house into a public forum.
"FIFTH ERROR: The Honorable Appellate Court erred in determining that there is no reason or legal basis to claim that the photographs taken of the claimant and his mother violated the right to privacy.
"SIXTH ERROR: The Honorable Appellate Court erred in determining that the case of Colón v. Romero Barceló, 112 DPR 573 is different from this case because in said case none of the claimants consented to waive their right to privacy.
"SEVENTH ERROR: The Honorable Appellate Court erred in determining that the claimant party was reckless." Petition for *certiorari,* pp. 5-6.

3    "It is personal inviolability in its most *complete and broadest* form. Honor and privacy are values of the individual that *deserve full protection,* not only against attacks from other individuals, but also against abusive interference from the authorities." 4 Journal of Sessions of the Constituent Convention 2566 (1951).

4    In *Colón v. Romero Barceló,* 112 D.P.R. 573 (1982), took into consideration that the defendants could carry out their message in another way and means, without harming the claimants' privacy.

5    As we stated in *P.P.D. v. Gobernador I,* 139 DPR 643 (1995), the courts may examine and reach their own conclusions regarding the nature and partisan purposes of some advertisements.

---

End of Document      © 2022 Thomson Reuters. No claim to original U.S. Government Works.